Jacob SCHANK and Kathryn Schank, Plaintiffs and Appellants,

v.

NORTH AMERICAN ROYALTIES, INC., and Louis W. Hill, Jr., Defendants and Respondents.

E. F. RAKOWSKI, Plaintiff and Appellant,

v.

NORTH AMERICAN ROYALTIES, INC., and Louis W. Hill, Jr., Defendants and Respondents.

Civ. Nos. 8773, 8774.

Supreme Court of North Dakota.

Aug. 9, 1972.

Rehearing Denied Nov. 3, 1972.

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for plaintiffs and appellants.

Pearce, Engebretson, Anderson, Schmidt & Thames, Bismarck, for defendants and respondents.

TEIGEN, Justice.

The plaintiffs have appealed from separate judgments in two actions to quiet the title to certain mineral interests in land on the theory that certain oil and gas leases given by the plaintiffs to the defendants terminated because of the failure of the defendants to pay delay rentals or to commence a well. Separate actions were brought by each of the plaintiffs against the same defendants. The cases were consolidated for the purpose of trial. Separate judgments were entered and separate appeals were taken. The appeals were consolidated for the purposes of argument and briefing in this court. Because the issues are identical, both cases will be decided in this opinion.

The plaintiffs hereinafter will be referred to as the lessors and the defendants as the lessees.

On May 28, 1969, the lessees obtained from each of the lessors separate oil and gas leases covering their respective fractional interests ($^{110}/_{560}$) in the minerals in 560 acres of land. The Schank lease became effective on July 1, 1969, and the Rakowski lease became effective on July 2, 1969. The effective dates of these leases coincide with the expiration dates of form-

er oil and gas leases between the parties. The leases were made for a primary term of five years and contain the usual "unless" clause:

"If no well be commenced on said land on or before * * * [1st day of July, 1970, in the Schank lease and the 2nd day of July, 1970, in the Rakowski lease] this lease shall terminate as to both parties, unless the lessee on or before that date * * * [shall pay delay rental] which shall operate as a rental and cover the privilege of deferring the commencement of a well for twelve months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods of the same number of months successively."

No delay rentals were paid on either lease but, on May 18, 1970, drilling operations were commenced and an oil and gas well was drilled, not by the lessees but by Cardinal Petroleum Company, the owner of a lease covering other undivided mineral interests in the same land. This well was not induced or procured by the lessees nor was it drilled under any agreement or understanding between Cardinal and the lessees. The lessees did not pay, agree to pay, or in any way contribute toward the cost of drilling the well. Cardinal completed the well on June 8, 1970, and reported it as a producer of oil and gas on June 19, 1970. The well has been in production since that date.

At the time Cardinal obtained from the state geologist a permit to drill, there was in effect a spacing order, which had been entered by the North Dakota Industrial Commission on June 22, 1967. This order extended the field limits of the Dickinson-Heath Pool in Stark County, North Dakota, to include all of the lands involved in these cases, and other lands, and provided for the spacing of wells, allowing one well per 320 acres. The order did not specify the quarter sections to be included in the 320-acre spacing units. The order also limited the location of wells in this spacing unit to the Southwest Quarter of the Northwest Quarter and the Southwest Quarter of the Southeast Quarter of each section of land within the pool limits.

Cardinal provided the lessees with progress reports of the drilling operation and, on June 18, 1970, the lessees made application to the Industrial Commission for a pooling order pooling all interests in the South Half of Section 15 (of this area only the Southeast Quarter of Section 15 is described in the leases in question) and designating North American Royalties, Inc. (lessee) as the operator. Cardinal also filed an application with the North Dakota Industrial Commission for a pooling order. It requested that the East Half of Section 15, all of which is included as a part of the leases in issue here, be pooled and asked that Cardinal be designated as the operator. Following two hearings, the Industrial Commission entered its final order on July 1, 1971, the salient parts of which are as follows:

"(2) That the application of North American Royalties, Inc., for an order designating the south ½ of Section 15, Township 140 North, Range 96 West, Stark County, as a spacing unit and pooling all interests therein is denied.

"(3) That all interests in oil and gas in the east ½ of Section 15, Township 140 North, Range 96 West, Dickinson-Heath Pool, Stark County, North Dakota, be and the same are hereby pooled and communitized for the purpose of forming a spacing unit in said Dickinson-Heath Pool, and that the well drilled in the SE ¼ of said section be the well for such spacing unit.

"(4) That Cardinal Petroleum Company is designated as the operator of said spacing unit and the producing well thereon and shall conduct operations in such manner as to protect correlative rights of all interested parties.

"(5) That all interested parties shall participate in the proceeds from this well

in the same proportion as their interests may appear in the spacing unit and the proportionate share of the costs of drilling, completing and producing the well shall be assessed against such parties as are responsible therefor in the same proportion as their interests may appear in the spacing unit."

The trial court concluded that the pooling order entered on July 1, 1971, resulted in an equitable pooling of an involuntary nature, pursuant to the provisions of Section 38–08–08, N.D.C.C., and operated in point of time as of the date of attainment of production (June 19, 1970). It found that the lessees had not participated in the risk of the drilling because of an absence of an agreement undertaking such risk, but were required, by the pooling order, to reimburse Cardinal in an amount equal to the lessees' proportionate share of the cost from the lessees' share of production, as per Sections 38–08–08 and 38–08–10, N.D. C.C. For these reasons the trial court concluded that the lessees were not required to pay delay rentals after the attainment of production in order to continue the leases in effect, and that the obligations of the lessees to the lessors were to be determined by the royalty clause of the contracts. It also held that the nonpayment of royalties during the period following the attainment of production and before the entry of the pooling order did not act as a breach of the leases for the reason that the interests of the fractional owners were pooled as of the date of attainment of production of the only well which was permitted to be drilled within the spacing unit; that the chargeable costs and expenses of drilling, completing and equipping the well could not be determined, paid or accounted for until the Industrial Commission had determined what lands would be included in the 320-acre spacing unit by the entry of its pooling order. For these reasons the trial court held that the failure on the part of the lessees to pay delay rentals, which became due after production had been attained, did not result in a termination of the leasehold estates and that the lessees had complied in full with all of the terms, covenants and conditions of the leases.

■ The cases were tried to the court without a jury and appeals from the judgments were taken after July 1, 1971, which was after the effective date of the repeal of the trial de novo statute. In taking their respective appeals, the lessees demanded a trial de novo on review in this court. However, they also filed and served specifications of error. In view of the repeal of the trial de novo statute before these appeals were taken, we will not consider them as being here de novo. Trengen v. Mongeon, 200 N.W.2d 50 (N. D.1972).

The lessees, in resistance to these appeals, challenge the lessors' specifications of error on the ground that the specifications do not comply with the requirements of particularity required under Section 28–18–09, N.D.C.C. This resistance was first raised in the lessees' brief filed in this court shortly before the arguments. The lessors moved, in open court, to file supplemental specifications of the insufficiency of the evidence under Section 28–27–26, N.D.C.C., which section allows the amendment of appeals when a party in good faith shall give notice of appeal and shall omit, through a mistake or accident, to do any other act necessary to perfect the appeal in order to make it effectual. The motion was resisted by the lessees and was taken under advisement by this court. Upon examination we find that both parties have fully briefed and argued the merits and issues set forth in the amended specifications of error and, finding that the appeal was taken in good faith, we hereby grant the motion and order that the amended specifications of error, a copy of which was served upon the lessees in open court, be filed.

It appears that the principal question here is whether, under the terms of the respective leases, our conservation statutes, the orders of the Industrial Commission, and the "unless" clause of the subject frac-

tional oil and gas leases providing that they will terminate unless a well is commenced or annual delay rentals are paid, the terms are satisfied so as to extend the leases, without the payment of annual delay rentals, by the commencement of a well upon the premises described in the leases by the owner of other fractional interests in the minerals underlying the same land and without participation by the lessees.

In addition to the "unless" clause quoted above, the habendum clause limits the grant:

"* * * unto the said *lessee*, its successors and assigns for the sole and only purposes of * * * mining and operating for oil and gas * * *" [Emphasis added.]

A thereafter clause provides that the lease shall remain in force for a term of five years and as long thereafter:

"* * * as oil or gas, or either of them, is produced from said land by the *lessee,* its successors and assigns." [Emphasis added.]

The leases also provide:

"*Lessee* shall have the right to drill to completion * * * (1) any well commenced within the term of this lease and (2) any well commenced within 90 days after the completion of a well which has been commenced within such term." [Emphasis added.]

The leases also provide that the "lessee" is granted the right and power to pool the acreage covered by the leases, or any portion thereof, with other lands, either before or after production, as determined in the judgment of the lessee to be advisable for the prevention of waste and for conservation, and for the greatest ultimate recovery of oil or gas.

The leases also contain a paragraph which provides that compliance with any now or hereafter existing law, order, judgment, decrees, or rules and regulations promulgated by either the state or federal courts, offices, boards or commissions, purporting to be made under authority of law, shall not constitute a violation of any of the terms of the lease nor be considered a breach thereof.

It appears agreed that, in the absence of the conservation statutes and the orders of the Industrial Commission, the leases would have terminated by their own terms without affirmative action on the part of the lessors, upon the lessees' failure to commence a well or to pay delay rentals within the period provided in the leases. See 38 Am.Jur.2d Gas and Oil, Section 207; 58 C.J.S. Mines and Minerals § 203; Summers Oil and Gas, Permanent Edition, Vol. 2, Ch. 11, Section 337, and Vol. 3, Ch. 15, Section 452. In this state we have held that the "unless" clause in an oil and gas lease, providing that the lease shall terminate one year from the date thereof unless the lessee shall, within that time, commence drilling operations or pay delay rentals, states a common law or special limitation upon which the interests of the lessee terminate immediately, ipso facto, without any notice or demand on the part of the lessor. Woodside v. Lee, 81 N.W.2d 745 (N.D.1957).

In Earp v. Mid-Continent Petroleum Corporation, 167 Okl. 86, 27 P.2d 855, 91 A.L.R. 188 (1933), it was held that, under an "unless" lease of an undivided interest in land, drilling operations necessary to keep the lease in force, in the absence of extrinsic conditions to the lease, would have to be by the lessee and that drilling by the lessee of other undivided interests in the same land would, during the primary term of the lease, be ineffective to perpetuate the lease. The reasoning in *Earp* has been followed in the following cases: Willson v. Superior Oil Company, 274 S. W.2d 947 (Tex.Civ.App.1954); Mattison v. Trotti, 262 F.2d 339 (5 Cir. 1959); Wagner v. Mounger, 253 Miss. 83, 175 So.2d 145 (1965).

We have here two lessees of separate fractional interests in the same 560 acres

of land. We also have a spacing order in effect which limits the number of wells to one per 320 acres of land and requires that the well site be located in the Southwest Quarter of the Southeast Quarter and the Southwest Quarter of the Northwest Quarter of each section. The spacing order does not, however, designate the second quarter section of land to be included with the drill site quarter to make up the 320-acre spacing unit. Cardinal obtained two drilling permits, one for the Southeast Quarter of Section 15 and the other for the Northwest Quarter of Section 14. Both drill sites are located on land described in the leases in issue here, and the leases contain no other land eligible under the 320-acre spacing order for a drilling permit. In other words, Cardinal had obtained drilling permits for the only drill sites on the lessors' land which were eligible under the spacing order.

Cardinal drilled a well on the permissible drill site located in the Southeast Quarter of Section 15. This well was reported as a producer on June 19, 1970, and has continued in production since that date. Cardinal has not drilled a well in the Northwest Quarter of Section 14.

Prior to the commencement of drilling by Cardinal in the Southeast Quarter of Section 15, there was communication, both oral and written, between the lessees and Cardinal. Cardinal proposed that a voluntary pooling agreement be entered into to pool the interests in the East Half of Section 15, and that an operating agreement be entered into naming Cardinal as the operator. The lessees rejected the offer, stating that it was their desire that the pooling unit should be defined as the South Half of Section 15 and that North American Royalties, Inc. (lessee) be named as the operator.

Voluntary agreements for the pooling of separately owned interests in a spacing unit are recognized by statute. Section 38–08–08, N.D.C.C.

Cardinal also invited the lessees to participate in the costs of the drilling and forwarded to them an Authorization for Expenditure form. The inability of the lessees and Cardinal to agree upon the land to be included in the proposed voluntary pooling unit and who should be the operator of the well if it became a producer did not prevent the lessees from accepting Cardinal's request that the lessees participate in the cost of drilling the proposed well as both owned an interest in the drill site quarter. However, when the lessees and Cardinal were unable to agree upon these matters, the lessees returned, unsigned, the Authorization for Expenditure form to Cardinal and refused to participate in the costs of drilling the proposed well. Thereafter, on May 18, 1970, Cardinal commenced drilling on the Southeast Quarter of Section 15 without participation by the lessees. This well was completed on June 8, 1970, and was reported as a producer of oil and gas on June 19, 1970. Had it resulted in a dry hole, the lessees would not have been obligated to Cardinal for any part of the costs or expenses of the drilling. Willson v. Superior Oil Company, *supra.*

The first delay rentals under the leases in question were due on July 1 and 2, 1970, and were not paid by the lessees.

As set forth above, the lessees and Cardinal each made an application to the Industrial Commission for a pooling order, which resulted in the final order being entered on July 1, 1971, pooling the East Half of Section 15 and naming Cardinal as the operator.

Admittedly, no well was commenced by the lessees nor did they participate in the well drilled by Cardinal on the leased premises. The well drilled by Cardinal, without participation by the lessees, does not satisfy the requirements of the leases unless the spacing order of June 22, 1967, the completion of a producing well by Cardinal in June 1970, and the pooling order

of July 1, 1971, have the legal effect of continuing these leases.

The Conservation Act (Ch. 38–08, N.D.C.C.), on the control of gas and oil resources, prohibits the waste of oil and gas (Section 38–08–03, N.D.C.C.). This Act places jurisdiction and authority in the Industrial Commission (referred to as the commission) over all persons and property, public and private, necessary to enforce the provisions of the Act and directs that the state geologist shall act as supervisor, charged with the duty of enforcing the regulations and orders of the Commission and the provisions of the statutes. Section 38–08–04, N.D.C.C. The pertinent statutes of this chapter for consideration in these cases provide:

"It shall be unlawful to commence operations for the drilling of a well for oil or gas without first giving to the state geologist notice of intention to drill, or without first obtaining a permit from the state geologist, under such rules and regulations as may be prescribed by the commission and paying to the commission a fee of twenty-five dollars for each such well." Section 38–08–05, N.D.C.C.

"1. When necessary to prevent waste, to avoid the drilling of unnecessary wells, or to protect correlative rights, the commission shall establish spacing units for a pool. Spacing units when established shall be of uniform size and shape for the entire pool, except that when found to be necessary for any of the purposes above mentioned, the commission is authorized to divide any pool into zones and establish spacing units for each zone, which units may differ in size and shape from those established in any other zone.

"2. The size and shape of spacing units are to be such as will result in the efficient and economical development of the pool as a whole.

"3. An order establishing spacing units for a pool shall specify the size and shape of each unit and the location of the permitted well thereon in accordance with a reasonably uniform spacing plan. * * *

"4. An order establishing units for a pool shall cover all lands determined or believed to be underlaid by such pool, and may be modified by the commission from time to time to include additonal areas determined to be underlaid by such pool. * * *" Section 38–08–07, N.D.C.C.

"1. When two or more separately owned tracts are embraced within a spacing unit, or when there are separately owned interests in all or a part of the spacing unit, then the owners and royalty owners thereof may pool their interests for the development and operation of the spacing unit. In the absence of voluntary pooling the commission upon the application of any interested person, shall enter an order pooling all interests in the spacing unit for the development and operations thereof. Each such pooling order shall be made after notice and hearing, and shall be upon terms and conditions that are just and reasonable, and that afford to the owner of each tract or interest in the spacing unit the opportunity to recover or receive, without unnecessary expense, his just and equitable share. Operations incident to the drilling of a well upon any portion of a spacing unit covered by a pooling order shall be deemed, for all purposes, the conduct of such operations upon each separately owned tract in the drilling unit by the several owners thereof. That portion of the production allocated to each tract included in a spacing unit covered by a pooling order shall, when produced, be deemed for all purposes to have been produced from such tract by a well drilled thereon.

"2. Each such pooling order shall make provision for the drilling and operation of a well on the spacing unit, and for the payment of the reasonable actual

cost thereof by the owners of interests in the spacing unit, plus a reasonable charge for supervision. In the event of any dispute as to such costs the commission shall determine the proper costs. If one or more of the owners shall drill and operate, or pay the expenses of drilling and operating the well for the benefit of others, then, the owner or owners so drilling or operating shall, upon complying with the terms of section 38–08–10, have a lien on the share of production from the spacing unit accruing to the interest of each of the other owners for the payment of his proportionate share of such expenses. All the oil and gas subject to the lien shall be marketed and sold and the proceeds applied in payment of the expenses secured by such lien as provided for in section 38–08–10." Section 38–08–08, N.D.C.C.

"A person to whom another is indebted for expenses incurred in drilling and operating a well on a drilling unit required to be formed as provided for in section 38–08–08, may, in order to secure payment of the amount due, fix a lien upon the interest of the debtor in the production from the drilling unit or the unit area, as the case may be, by filing for record, with the register of deeds of the county where the property involved, or any part thereof, is located, an affidvait setting forth the amount due and the interest of the debtor in such production. * * * The lien may be foreclosed as provided for with respect to foreclosure of a lien on chattels." Section 38–08–10, N.D.C.C.

■ Neither the lessees nor the lessors have cited a case, either from North Dakota or from any other state, in point on the principal question involved here, and we have found none. It is a well-established general rule in most jurisdictions that the owners of undivided portions of gas and oil rights in and under the same land are tenants in common and each cotenant may enter upon the premises for the purpose of exploring for oil and gas and may drill and develop such premises. Each cotenant may exercise the same right and privilege with reference to the common property. Each owner in a cotenancy acts for himself, and no one is the agent for the other nor has any authority to bind the other merely because of the relationship, unless authorized to do so. Upon discovery of oil and gas upon the premises, the producing cotenant must account to the nonconsenting or nonproducing cotenant for his pro rata share of the net profits apportioned according to the fractional interest of said cotenant. Each cotenant may lease his undivided interest in the common property without the consent of the other cotenants and such lease is effective as to his interest in the property but ineffective as to the interest belonging to his cotenant. Earp v. Mid-Continent Petroleum Corporation, *supra;* Willson v. Superior Oil Company, *supra;* 38 Am.Jur. 2d Gas and Oil, Section 10; 58 C.J.S. Mines and Minerals § 156; 86 C.J.S. Tenancy in Common § 108.

These principles, we find, are in harmony with the laws of this state. Section 47–02–08, N.D.C.C., recognizes and defines interests in common as follows:

"An interest in common is one owned by several persons not in joint ownership or partnership. Every interest created in favor of several persons in their own right is an interest in common, unless acquired by them in partnership for partnership purposes, or unless declared in its creation to be a joint tenancy."

■ In Bilby v. Wire, 77 N.W.2d 882 (N.D.1956), we held that possession of the surface of land is not possession of the severed minerals; that after severance, surface and mineral estates are held by separate and distinct titles in severalty and each is a freeholder estate of inheritance.

■ In Smith v. Nyreen, 81 N.W.2d 769 (N.D.1957), we held that where owners of land sold it to another, conveying the surface but only a fraction of the mineral in-

terests and reserving a fraction thereof, the owners held possession of the minerals in common and were cotenants.

■ In Stevahn v. Meidinger, 79 N.D. 323, 57 N.W.2d 1 (1952), this court held that a cotenant is not under disability; he can deal with strangers as he will insofar as his own undivided moiety is concerned, but he cannot dispose of the interests of his cotenant unless the first cotenant is duly authorized to do so; and his attempts to dispose of his cotenant's interests are not binding upon his cotenant and operate to pass nothing more than the seller's own interest. The law of cotenancy is consistent with our oil and gas conservation statutes. For these reasons we ascribe to the general principles of law set forth above pertaining to cotenancy insofar as they relate to oil and gas interests, except as they may be modified by our statutes on oil and gas.

■ It is also held that mineral lessees of different cotenants become cotenants of each other. Earp v. Mid-Continent Petroleum Corporation, *supra;* Moody v. Wagner, 167 Okl. 99, 23 P.2d 633 (1933).

It is clear that under the terms of the leases and in the absence of conservation statutes and orders of the Industrial Commission the drilling of the well by Cardinal did not constitute commencement of a well by the lessees as required by the leases. The lessees having failed to make delay rental payments, the leases would have terminated by their own terms. In their argument the lessees do not dispute this principle: They contend, however, that under our statutes and the rules, regulations and orders of the North Dakota Industrial Commission, which become a part of the contract, a different result will inure here.

■ The leases provide that compliance with any act, bill or statute enacted by the state, or orders, judgments, decrees, rules or regulations made or promulgated by state courts, boards, commissions or committees, made under authority of law,

shall not constitute a violation of any of the terms of the leases or be considered a breach of any clause, obligation, covenant, condition or stipulation contained therein, and shall not constitute a cause for termination or forfeiture. The lessees advance the theory that the spacing order issued by the Industrial Commission in 1967, including these and other lands, and limiting the number and location of wells to one each in the Northwest and Soutwest Quarters of a 320-acre spacing unit, effected a de facto pooling of all interests under the drill site. The lessees admit that such spacing order allowed, but argue that it did not require, the collective action of the fractional owners in sharing the risk of drilling, and if a fractional owner drilled a well without participation by the other fractional owners such action would be deemed collective as to all fractional owners of the drill site unit; that the subsequent pooling order entered by the Industrial Commission a year later was for the sole purpose of determining which additional quarter section of land should be pooled with the drill site quarter in order to comply with the required 320-acre spacing, and to designate the operator of the well. For these reasons, they argue, the lessees in fact participated in the drilling of the well by Cardinal because they acquiesced in Cardinal's action by accepting Cardinal's offer to drill the well. It is the contention of the lessees that their acquiescence by refraining to exercise their rights under Industrial Commission Rule No. 104, which required a forced pooling by the Industrial Commission before the well was drilled, constituted an acceptance of Cardinal's offer to drill. Rule No. 104 provides, in part:

"No well shall be drilled upon any such governmental quarter-quarter section or governmental lot corresponding thereto when the same shall embrace two or more separately owned tracts or where there are separately owned interests in all or part thereof unless and until the said separately owned tracts or interests shall have been pooled either vol-

untarily or in accordance with the laws of the State of North Dakota."

Rule 104 is applicable only "in the absence of an order by the Commission setting spacing units for a pool."

It appears to be the argument of the lessees that because the Industrial Commission, in entering its spacing order in 1967, failed to define the geographical boundaries of the 320-acre spacing units established by its order, Rule 104 was applicable and that the lessees' failure to resist drilling by Cardinal by invoking the Rule amounted to an acquiescence and acceptance and, therefore, constituted participation with Cardinal in the drilling of the well. In other words, they contend that lessees' failure to object on the legal grounds available to them amounts to an acceptance and acquiescence of Cardinal's offer to drill the well and, therefore, they should now be favored with a decision of this court to the effect that their nonaction inures to their benefit. We cannot agree. Certainly the lessees would not have claimed acquiescence and participation by nonaction had the well turned out to be a dry hole.

■ The lessees also argue that the leases were extended because, prior to the due date of the delay rental payments and while their leases were in effect, production was obtained from the lands by Cardinal, and that royalties accrued in favor of the lessees under the terms of the royalty clause of their leases; that these accruals were being accumulated by Cardinal to apply to the lessees' proportionate share of the cost of drilling, completing and producing the well. We do not agree that the accumulation of royalties by Cardinal in favor of the lessees during the primary term of the leases is a condition which will extend the leases as long as production occurs. If there was an accumulation of royalties prior to July 1 and 2, 1970, such accumulation would, of course, inure to the benefit of the lessees as the leases were then in effect and, under them, the lessees

were the owners of seven-eighths of the royalties produced from the lessors' fractional interests. However, there is no provision in the leases or in the statutes which provides that production by a stranger, accumulating to the benefit of a fractional lessee, operates to extend the lessee's lease when the lessee has not participated in the drilling of the well.

The lessees also contend that the Industrial Commission's order of July 1, 1971, pooling the East Half of Section 15, was not appealed and has become final. Therefore, a finding that there was "statutory participation" in the drilling of the well is a final determination of the question of participation and is not subject to collateral attack. The language referred to by the lessees in the Industrial Commission's order is Finding No. 21. It reads as follows:

"That since Cardinal Petroleum Company drilled the well in the SE ¼ of Section 15, Township 140 North, Range 96 West, with *statutory participation* but without joinder in the risk by North American Royalties, Inc., and since Cardinal Petroleum Company is presently operating the well, Cardinal Petroleum Company should be the operator of said well." [Emphasis added.]

■ We have not been advised by the lessees or by the Industrial Commission order what is meant by the term "statutory participation" in the above quoted finding. We find no statute and none has been pointed out to us which alters the legal relationship of cotenants of mineral lands when one cotenant drills a well on the jointly owned land in the absence of an express agreement between them.

"The legal fact of cotenancy of mineral lands, claims or leases is insufficient to create a mining partnership. In the absence of express agreement, joinder in the operation of the lands, claims or leases for mineral purposes is positively essential. If one cotenant fails or refuses to join in operating the land, his rela-

tionship with the others remains that of cotenancy, and if, having joined in the operations, he withdraws, his relationship reverts to that of cotenancy, subject to the liabilities incurred while he was a member of the mining partnership." Summers, Oil and Gas, Permanent Edition, Vol. 4, § 723.

■ Furthermore, the Industrial Commission is an administrative agency and, as such, is not empowered by the statutes to determine the legal relationship between a lessor and a lessee. This is a matter for the courts in an appropriate action. Furthermore, the quoted portion of the order is a finding and not an adjudication. We are of the opinion that there was no intent on the part of the Industrial Commission to attempt to adjudicate the status of the leases between the lessees and the lessors by the use of the term in its findings of fact. We see no merit in the argument.

It is also pointed out that Section 38-08-08(1), N.D.C.C., in part, provides as follows:

"Operations incident to the drilling of a well upon any portion of a spacing unit covered by a pooling order shall be deemed, for all purposes, the conduct of such operations upon each separately owned tract in the drilling unit by the several owners thereof."

■ The lessees argue that the above quoted portion of the statute makes the lessees participants on the same basis as Cardinal "in all ways in the drilling of the well on the subject tract." Section 38-08-08(1), N.D.C.C., is quoted earlier in this opinion. It deals with two situations: (1) where there are "separately owned tracts," and (2) where there are "separately owned interests" in all or part of a spacing unit. The latter is applicable only where there is voluntary pooling. The above quote, which deals with forced pooling, is applicable only where there are separately owned tracts and not separately owned interests in the same tract. We are concerned here with separately owned interests in the same tract.

In Whildin v. Maryland Gold Quartz Mining Co., 33 Cal.App. 270, 164 P. 908 (1917), it was held that, as applied to a mineral location, the word "tract" implies a surface location. Black's Law Dictionary, Fourth Edition, defines "tract" as "a lot, piece or parcel of land, of greater or less size, the term not importing, in itself, any precise dimension." A definition of "tract" given in Webster's Third New International Dictionary, is "a region · or stretch (as of land) that is usu. indefinitely described or without precise boundaries." Words and Phrases, Permanent Edition, cites a number of cases which define "tract" as an area or parcel of land which is indefinite in its dimensions.

■ A spacing unit is defined as an area from which oil or gas may be efficiently and economically produced by one well. The statute requires that an order establishing spacing units shall cover all lands determined or believed to be underlaid by a pool. Section 38-08-07, N.D.C.C. Thus the term "spacing unit" as used in Sections 38-08-07 and 38-08-08, N.D.C.C., is synonymous with "drilling unit" as used in that portion of Section 38-08-08(1), N.D.C.C., quoted above. For these reasons we find that the above quoted portion of Section 38-08-08(1), N.D.C.C., is not applicable in these cases.

The lessees also argue that the lessors have no interest in nor right to question the manner in which the lessees choose to fulfill their contract obligation with their lessors. The lessees admit they did not share the risk in the event of a dry hole but contend that that is no business of the lessors and, since lessees acquiesced in the drilling, they have participated therein pursuant to statute. The lessees argue that the lessors have made no demand and no question has been raised of any kind concerning the conduct of the operations by the lessees or by Cardinal, and that it is no concern of the lessors what methods may

█ **433**

be employed by the lessees in order to obtain production and satisfy the lease requirements.

██ This argument, in our opinion, places the wrong construction upon the leases, which are contracts. We have pointed out earlier that these leases grant "unto said *lessee*" [emphasis added] the lessors' interests in the land for the sole and only purpose of mining and operating for oil and gas, and that the leases are extended if "oil or gas or either of them is produced from said land by the *lessee*" [emphasis added], and that the *"lessee* shall have the right to drill to completion" [emphasis added]. Under the terms of these contracts, the lessors have every right to look to the lessees to carry out these terms by some affirmative action on the part of the lessees, not by the refusal on the part of the lessees to participate with the lessee of other fractional interests who drills a well on the land.

We agree with the following statement contained in *Earp,* in which case the Oklahoma court was concerned with an "unless" lease similar to the leases in this case. *Earp* has been followed in Willson v. Superior Oil Company, *supra,* and Wagner v. Mounger, *supra.* The supreme court of Oklahoma in *Earp*, said:

"Such contracts are almost universally held to be made for the general purpose of developing the premises by the lessee, and the uniform tendency on the part of the courts has been to place such a construction on their terms as will carry out the terms, intent, and purpose of the agreement. The contract being executed for the purpose of procuring development upon the premises by the lessee the clause should be interpreted to mean that the lessee is required to do the drilling and that the act of a third party independent of any co-operation on the part of the lessee is not a compliance with the terms of the lease. A contrary construction on the terms of the lease would sanction holding the lease for speculative purposes which is in direct conflict with the primary purpose for which such a lease is executed. It is said in the recent edition (1932) of Thornton on Oil and Gas: 'An oil or gas lease cannot be held for merely speculative purposes. No lease of land for a rent for a return to the landlord out of the land which passes can be construed to be intended to enable the tenant merely to hold the lease for purposes of speculation, without doing and performing therewith what the lease contemplated. Such a construction would, indeed, make all such contracts, a snare for the entrapment and injury of the unwary landlord.' " Earp v. Mid-Continent Petroleum Corporation, 167 Okl. 86, 27 P.2d 855, 864.

██ We hold that there must be something more than passive acquiescence by a lessee of a fractional interest to claim as his own the act of drilling a well by a cotenant lessee of other fractional interests in the land. The lessees were afforded an opportunity to participate in the drilling but declined Cardinal's invitation to participate. Thus the lessees refused to participate in the risk and now that production has been attained by Cardinal they cannot claim participation by passive acquiescence. Cardinal elected to take the risk, without the right to proportionate reimbursement from the cotenant lessees for the drilling costs in the event of a dry hole, and we see no reason, under the terms of these leases, the statutes, and the orders of the Industrial Commission, that justifies a holding that the attainment of production by Cardinal, a lessee of other cotenants, should extend the leases of these lessees under the "thereafter" clause.

For the reasons set forth herein we hold that the Schank lease and the Rakowski lease terminated by nonpayment of delay rentals on July 1 and 2, 1970, respectively, according to the terms of their leases. Because there was production prior to the termination dates of these leases, we also hold that the lessees are entitled to their proportionate shares of the royalties from

the oil produced prior to July 1, 1970, from the Schank fractional interest and from that produced prior to July 2, 1970, from the Rakowski fractional interest, less their proportionate obligations for the necessary and reasonable expenses incurred in the producing and marketing accumulated prior to the termination of the respective leases.

The judgments are reversed.

ERICKSTAD, Acting C. J., PAULSON and KNUDSON, JJ., and ROY A. IL- VEDSON, District Judge, concur.

ALVIN C. STRUTZ, C. J., deeming himself disqualified did not participate; ROY A. ILVEDSON, Judge of the Fifth Judicial District, sitting in his stead.