**Anthony B. MURPHY, As Trustee of Murphy Land Trust, Plaintiff,**

v.

**AMOCO PRODUCTION COMPANY, a corporation, Defendant.**

Civ. No. A1–82–91.

United States District Court,
D. North Dakota,
Southwestern Division.

May 2, 1984.

Albert J. Hardy, Dickinson, N.D., for plaintiff.

Gary R. Wolberg, Bismarck, N.D., for defendant.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

This diversity case involves two oil and gas leases. The complaint has three counts, but the third count, a claim for an accounting, was severed from the main trial. See Order dated February 24, 1984. The remaining counts were tried before the Court on February 28–29, 1984, with the parties stipulating to certain background facts.

Plaintiff owns the mineral interests in the S½ of Section 2, all of Section 3, the E½ of the NE¼ of Section 10, the SE¼ of Section 10, the E½ of the SW¼ of Section 10, the SW¼ of Section 11, the N½ of Section 14, and the N½ of Section 15 of Township 146 North, Range 96 West, Dunn County, North Dakota. Defendant held leases on these interests at all times material to the case. The property is located in the Rattlesnake Point-Duperow field.

The disputes between plaintiff and defendant pertain to two wells drilled by defendant: the Murphy B–1 in the E½ of the NE¼ of Section 10 and the Lubke well in the NW¼ of Section 11. The Court will discuss the counts relating to each of these wells.

### COUNT ONE: THE MURPHY B–1 WELL

The lease on the E½ of the NE¼ of Section 10 ran for a primary term ending

January 16, 1980, at midnight, but could be automatically extended if drilling operations were commenced before the primary term expired. See Paragraphs 2 and 5 of Exhibit 7 to the parties' stipulated facts. Plaintiff claims that defendant wrongfully, willfully and maliciously trespassed on its property by spudding the Murphy B-1 after the lease expired. It also claims that defendant breached an implied covenant to use reasonable care and diligence in drilling operations.

Preparatory activities for drilling the Murphy B-1 began in December 1979. Around December 11, the well location was staked and surveyed. On December 18, defendant prepared an application for a well permit, which was approved on December 26. Negotiations with the surface owner, Hugh Murphy, began at least by December 21. And work on the access road and well location commenced on December 26 or 29.

By January 8, 1980, a drilling rig, workover rig capable of drilling to a depth of 16,000 feet, and other equipment were on the site. A 60-70 foot hole was drilled for the conductor pipe. On January 15, 1980, defendant's drilling contractor was within three to five hours of spudding the well, when it was served with an ex parte temporary restraining order (TRO), enjoining further drilling. The contractor complied with the TRO. On January 16, 1980, defendant filed an affidavit of lease extension with the appropriate county recorder.

The TRO issued from a district court for the State of North Dakota and was effective until defendant gave Hugh Murphy the written notice required by N.D.C.C. § 38-11.1-05. Defendant had intentionally failed to give such notice, on advice of counsel that the statute was unconstitutional.

On February 1, 1980, a show cause hearing was held, which resulted in the issuance of a preliminary injunction to the same effect as the TRO. Defendant served written notice on Hugh Murphy on February 2, 1980, and proceeded to spud the well that same day. Drilling continued for a total of 84 days until a depth of 14,288 feet at the Red River level was reached. The well was then plugged at 11,866 feet in the Duperow formation. Drilling to the Red River level took the ordinary and expected amount of time for the industry.

The drilling rig and workover rig remained on site until early 1981. The well was finally plugged on March 4, 1981, and around that same time defendant released the lease.

Hugh Murphy later sued defendant for damages to the surface. Defendant challenged the constitutionality of N.D.C.C. § 38-11.1-05 in the suit, and the Eighth Circuit ultimately ruled that the statute is constitutional. See Murphy v. Amoco Production Co., 729 F.2d 552 (1984).

 This Court finds that defendant did not trespass on plaintiff's property, because defendant's operations automatically extended the lease term. Drilling operations commence when (1) work is done preparatory to drilling, (2) the driller has the capability to do the actual drilling, and (3) there is a good faith intent to complete the well. See Muth v. Aetna Oil Co., 188 F.2d 844 (7th Cir.1951); Geier-Jackson Inc. v. James, 160 F.Supp. 524 (E.D.Tex.1958); LeBar v. Haynie, 552 P.2d 1107 (Wyo.1976). It is not necessary that the drill bit actually penetrate the ground. See Humphrys v. Skelly Oil Co., 83 F.2d 989 (5th Cir.1936).

Prior to the expiration date of the primary term, defendant had undertaken substantial activities in preparation for spudding the well. The work had progressed so far that the preliminary drilling for the piping was done. A workover rig capable of spudding was in place and operating. And defendant had a good faith intent to complete the well, as evidenced by the advanced stage of drilling operations reached on the eve of expiration and by defendant's actually and timely completing the well.[1]

1. Plaintiff argues that defendant's failure to comply with N.D.C.C. § 38-11.1-05 shows its

bad faith. However, the Court finds that this failure does not go to the specific bad faith at

█ The Court also finds that defendant did not breach its implied covenant to develop the well with reasonable diligence. This covenant is implied in an oil and gas lease where such construction would not be inconsistent with its express provisions. *See Hermon Hanson Oil Syndicate v. Bentz,* 77 N.D. 20, 27, 40 N.W.2d 304, 308 (1949). It is part of the implied obligation of a lessee to do everything that a reasonably prudent operator would do in developing, marketing and protecting the property, giving due consideration to the interests of both lessor and lessee. *See Olson v. Schwartz,* 345 N.W.2d 33, 38–40 (1984). The covenant is appropriately implied in the lease between plaintiff and defendant.

█ A temporary set-back in drilling operations is not necessarily a breach of this implied covenant. *Cf. Sorum v. Schwartz,* 344 N.W.2d 73, 76 (1984) (temporary cessation of production will not automatically terminate the lease). Rather, the Court must look to a totality of the circumstances to determine whether a lessee met the reasonably prudent operator standard. *See Olson,* 345 N.W.2d at 39–40.

█ Plaintiff contends that defendant failed to act reasonably when it chose to spud the well so close to the expiration date. As seen above, spudding is not the only act which triggers an automatic extension such as the one in this lease. Defendant began sufficient preparatory acts a reasonable time before the expiration date. In fact, it acted more promptly than many lessees as even a cursory review of the cases will reveal.

Plaintiff also claims that defendant failed to act with reasonable diligence when it necessarily delayed the spudding by failing to give the notice required by N.D.C.C. § 38–11.1–05.[2]

█ The statute was passed by the Legislature in 1979. *See* 1979 N.D.Sess.Laws ch. 396, § 5. Defendant did not comply

with it in order to test its validity. This course of action was not unreasonable. It was based on an arguably sound legal position. Defendant does not appear to have singled out Hugh Murphy or plaintiff for noncompliance. The TRO was obeyed, and defendant promptly challenged it in the hearing on the preliminary injunction. When the preliminary injunction issued, defendant complied with it within a short time and immediately resumed drilling. The delay in drilling operations was relatively short. The Court concludes that defendant acted as a reasonably prudent operator would have under the circumstances. Defendant did not breach implied covenants of the lease in its drilling activities on the Murphy B–1.

█ Plaintiff introduced evidence as to several types of misconduct by defendant in connection with the Murphy B–1. This evidence goes to plaintiff's claim for punitive damages. However, since there is no basis for awarding actual damages on Count One, the Court cannot award punitive damages. N.D.C.C. § 32–03–07 (Supp. 1983); *McCurdy v. Hughes,* 63 N.D. 435, 455, 248 N.W. 512, 520 (1933). The Court has evaluated the various allegations to see if they independently support recovery. Proof as to each is insufficient to establish a basis for recovery, although it is clear that defendant acted less than admirably in some circumstances.

COUNT TWO: THE LUBKE WELL

The Lubke well, on the NW¼ of Section 11, involves plaintiff's correlative rights as the owner of the mineral interests in the SW¼ of Section 11. Correlative rights consist of:

"The opportunity afforded, so far as it is practicable to do so, to the owner of each property in a pool to produce without waste his just and equitable share of the oil or gas, or both, in the pool; being an

issue, that is, lack of good faith intent to complete the well.

**2.** Defendant's failure to comply with N.D.C.C. § 38–11.1–05 was not an unreasonable way to

proceed as to plaintiff. On its face, the statute requires notice to surface owners only, not mineral owners.

amount, so far as can be practically determined, and so far as can practicably be obtained without waste, substantially in the proportion that the quantity of recoverable oil or gas, or both, under such property bears to the total recoverable oil or gas, or both, in the pool, and for such purposes to use his just and equitable share of the reservoir energy." There appear to be two aspects of the doctrine of correlative rights: (1) as a corollary of the rule of capture, each person has a right to produce oil from his land and capture such oil or gas as may be produced from his well, and (2) a right of the land owner to be protected against damage to a common source of supply and a right to a fair and equitable share of the source of supply.

*See Amoco Production Co. v. North Dakota Industrial Commission,* 307 N.W.2d 839, 842 n. 4 (N.D.1981) (citations omitted).

Within Count Two, plaintiff makes two separate claims regarding its correlative rights. One relates to its ability to participate in the Lubke well as the owner of unleased mineral interests rather than as a lessor. The other assumes the lease is not cancelled and relates to defendant's duty to protect these rights. Both arise out of common facts.

The Lubke well was a discovery well in an unproven pool. It was completed as a producing well on October 27, 1977, and on December 13, 1977, the North Dakota Industrial Commission held a hearing to determine temporary spacing for the Rattlesnake oil field. The purpose of well spacing is to regulate the number and location of wells over an oil or gas reservoir as a conservation measure. H. Williams & C. Meyers, Manual of Oil and Gas Terms 278 (1957). Defendant attended the hearing and presented testimony and exhibits, including a contour map (Tr.Ex. 38). Jack Murphy attended the hearing on behalf of plaintiff, but did not participate. At the time, the Commission allowed a developer to designate the direction of the spacing unit for his own benefit. Defendant designated the spacing for Section 11 as N½-S½, and this decision was incorporated into the Commission's temporary spacing order of January 12, 1978. No one appealed the order. Plaintiff was not entitled to royalties from production in the N½ of Section 11.

In March 1979, the Kelling well in the SE¼ of Section 11 was completed as a producing well. It was a poor producer and was finally plugged on June 10, 1982. Plaintiff received royalties on the production from this well.

On July 22, 1979, plaintiff applied to the Industrial Commission for a change in the direction of the spacing units on Section 11. A proper spacing hearing was held on July 24, 1979, and defendant again presented testimony and exhibits, including a contour map (Tr.Ex. 39). Defendant did not mention that any voluntary pooling agreements were in effect for Section 11. Jack Murphy, a member of plaintiff's board of directors, appeared on behalf of plaintiff, and read a prepared statement. He said that he was not seeking to have the spacing changed retroactively. By order dated August 10, 1979, the Commission changed the spacing from N½-S½ to E½-W½, and allocated production in accordance with this change as of 7:00 a.m. on September 1, 1979.

The Lubkes own an undivided one-half interest in the minerals under the N½ of Section 11. They and defendant appealed the Commission's proper spacing order to a state district court. In defendant's briefing, it stated that express or implied voluntary pooling agreements existed for the N½ and S½ of Section 11. The appellants also argued that the Commission based its order on insufficient evidence. The district court remanded the case to the Commission for the taking of further evidence.

The hearing on remand was held on May 20, 1980. Defendant appeared and presented testimony and exhibits. It introduced a new contour map (Tr.Ex. 79). Defendant said that there were no voluntary pooling agreements for Section 11. Plaintiff was represented at the hearing by an attorney and offered the testimony of a geologist.

The Commission retained E½–W½ spacing and included a provision making allocation of production retroactive to 7:00 a.m., September 1, 1979. Its order was dated June 19, 1980.

The Lubkes and defendant appealed the order on remand to the state district court, which affirmed. They then appealed to the North Dakota Supreme Court. The sole issue on defendant's appeals was the validity of the retroactive allocation of production. Before the appeal was heard, defendant was dismissed on its own motion. The Supreme Court affirmed the order on remand in a decision dated June 30, 1981. *See Amoco*, 307 N.W.2d 839.

Royalties from the Lubke well's production were held in escrow pending the appeal from the proper spacing order, the hearing on remand and further appeals. These funds were released after the Supreme Court decision came down. Plaintiff initially held its checks without cashing them and inquired into certain of its disputes with defendant. Eventually, however, plaintiff cashed the checks.

In a letter dated July 31, 1981, plaintiff asked the Industrial Commission to force pool the W½ of Section 11. By order dated August 26, 1981, the W½ was pooled, with the allocation of production retroactive to September 1, 1979. Defendant later requested force pooling of the S½ and E½ of Section 11. By order of November 17, 1981, the S½ was pooled from the date of first production to September 1, 1979, and the E½ was pooled, effective September 1, 1979.

### 1. Did the lease on the SW¼ of Section 11 expire?

Plaintiff claims that the lease on the SW¼ of Section 11 expired on January 16, 1980, at midnight, and that the lease should be cancelled. The effect of cancellation would be to allow plaintiff to participate in the Lubke well as the owner of the mineral rights from the date of first production, giving it substantially higher returns than it is entitled to under the lease.

The Commission's pooling order for the W½ of Section 11 describes plaintiff as "the owner of an interest in an oil and gas leasehold estate." It is clear that the Commission could not determine the legal relationship between plaintiff and defendant. *See Schank v. North American Royalties, Inc.*, 201 N.W.2d 419, 432 (N.D.1972). Absent a showing that plaintiff affirmatively represented itself as a lessor, the Court has no reason to consider the Commission's characterization of plaintiff's interest as conclusive. No such showing was made at trial.

Plaintiff admits that defendant kept up with the delay payments necessary to keep the lease alive during the primary term ending January 16, 1980. And plaintiff concedes that the lease did not expire if the SW¼ was pooled with a producing well before expiration of the primary term. This concession is apparently based on Paragraphs 4 and 5 of the lease (Exhibit 18 to the parties' stipulated facts) and N.D. C.C. § 38–08–08. However, plaintiff argues that the pooling order for the W½ of Section 11 took effect after the expiration date of January 16, 1980, since it was dated August 26, 1981.

Two provisions of the order are pertinent to the issue at hand:

IT IS THEREFORE ORDERED:

(1) That all oil and gas interests in a spacing unit for the Rattlesnake Point-Duperow Pool described as the W/2 of Section 11, Township 146 North, Range 96 West, Dunn County, North Dakota, are hereby pooled for the development and operation of the spacing unit.

\*　　\*　　\*　　\*　　\*　　\*

(7) That this order shall remain in full force and effect until further order of the Commission, and allocation of production pursuant to this order shall include all production since September 1, 1979 at 7:00 a.m.

Neither party challenges the validity of the retroactive provision.

Ordinarily, pooling means the bringing together of small tracts sufficient to quali-

fy for a well permit under applicable spacing rules. H. Williams & C. Meyer, Manual of Oil and Gas Terms 184 (1957). When tracts are pooled after a well is drilled, as is the case here, the purpose of pooling is to allocate the production and costs among the interest owners in the spacing unit. 6 H. Williams & C. Meyer, Oil and Gas Law § 905.1 at 14 (1981). Given this purpose, the Commission must have intended to pool the W½ effective as of September 1, 1979. To call an allocation of production something different from pooling makes little sense.

The history of the spacing orders also suggests that the pooling was to be effective retroactively. The proper spacing order and order on remand specified:

(13) That for the purposes of division of production to owners of interests in spacing units established herein, this order shall be effective at 7:00 a.m. on the 1st day of September, 1979.

One commentator interprets pooling orders to be retroactive, even though they do not contain retroactive provisions, if the spacing orders contained retroactive provisions. *See* O. Anderson, Compulsory Pooling in North Dakota: Should Production Income and Expenses Be Divided from Date of Pooling, Spacing, or "First Run," 58 N.D.L.Rev. 537, 559, 570 (1982).

Such an interpretation is particularly warranted in this case because of the change in the spacing direction. Defendant paid out royalties to the owners of the mineral interests in the N½ of Section 11, relying on the temporary spacing order. And those owners accepted the royalties, also relying on the temporary spacing order. At the proper spacing hearing, plaintiff had an opportunity to request that the proper spacing order be retroactive to the date of first production, but specifically waived its right to that relief. Thus, the Commission set a date for the allocation of production for the W½ which would protect the reliance of defendant and the mineral owners in the N½.

 This Court recognizes that under North Dakota law, a spacing order is not a de facto pooling order. *See Schank*, 201 N.W.2d at 422–23. *Schank* involved tracts of land in which several land owners held undivided fractional interests in the minerals. As to each tract, one owner leased its interest to North American, and another owner, Cardinal, drilled a well without North American participating in any way. If the interests in each tract were pooled, then Cardinal's drilling was deemed to be North American's drilling, automatically extending the primary term on North American's leases. The North Dakota Supreme Court refused to let North American use the spacing orders to trigger the automatic extension, since it had taken no risk in the drilling. North American could not claim the benefit of the drilling when it "would not have claimed ... participation by nonaction had the well turned out to be a dry hole." *Id.* at 431.

This case differs from *Schank*. First, in *Schank*, the Supreme Court did not have to interpret the interrelationship between provisions in a spacing order and the effective date of a pooling order. Second, the spacing order in this case is more likely to be considered a de facto pooling order than the spacing order in *Schank*. Defendant, who took the risk, is also trying to claim the benefit. On the other hand, plaintiff, who took no risk in drilling the Lubke well and who waived its right to two years of royalties, is now trying to claim a greater share of the production. The Court concludes that *Schank* does not prevent it from following the Anderson interpretation referred to above.

The pooling order for the W½ must also be interpreted in connection with the pooling orders for the S½ and E½ of Section 11. The pooling order for the S½ states:

(2) That this pooling shall be effective from the date of first production from said described spacing unit until 7:00 a.m. on the 1st day of September 1 [sic], 1979.

The pooling order for the E½ states:

(2) That this order shall be effective as of 7:00 a.m. the 1st day of September, 1979.

The language of these pooling orders indicates that when the Commission wants a pooling to be effective retroactively, it is fully capable of articulating that intent in unambiguous language. However, the pattern of the three pooling orders, along with the background of the case, suggest that the Commission intended the pooling for the W½ of Section 11 to be effective retroactively, just as it was for the S½ and E½.

Finally, the Court notes that there is no evidence that plaintiff has detrimentally relied on a belief that the lease had expired.

 Therefore, the Court finds that the SW¼ of Section was pooled effective September 1, 1979, and that the lease on the SW¼ did not expire on January 16, 1980. Plaintiff is not entitled to relief on this claim.

### 2. Did defendant knowingly misrepresent certain facts in connection with the spacing direction for Section 11?

For its second claim in Count Two, plaintiff contends that defendant had a duty to exercise its so-called pooling power fairly and in good faith and consistent with its fiduciary duty owing to plaintiff. It alleges that defendant breached this duty by knowingly misrepresenting certain facts at the well spacing hearings and appellate proceedings, which caused plaintiff to incur substantial expenses to protect its correlative rights. In particular, plaintiff wants to recover attorney's fees for representation at the hearings and on the appeals and for miscellaneous inquiries into various matters; the expert fees of accountants and a geologist; reimbursements for Jack Murphy's time and travel expenses; and miscellaneous expenses such as the cost of postage.

Defendant argues that the proceedings before the Industrial Commission, the state district court, and the North Dakota Supreme Court bar the claim for expenses under principles of res judicata, relying on *Trahan v. Superior Oil Co.*, 700 F.2d 1004 (5th Cir.1983). In *Trahan*, the lessors alleged that the lessee failed to fairly present evidence at unitization hearings, and, as a result, their property was not included in the unit. They alleged that their property was being drained by wells located in the unit and sought cancellation of the lease or damages in the amount of twice the royalties due. In essence, they were seeking relief that would put them in a position equivalent to that which they would have been in had their property been included in the unit. Emphasizing that the lessors did not allege fraud, lack of good faith or intentional deception, the Court dismissed their case as an impermissible collateral attack on the unitization order.

 This case differs from *Trahan* in several respects. First, plaintiff does not seek to overturn any of the Commission's spacing orders, either directly or in practical effect. Second, plaintiff does allege intentional misrepresentation which would allow the suit even if it were seeking to overturn a spacing order.

 In addition, under North Dakota law, this is not an appropriate case for applying res judicata. In North Dakota, res judicata applies only when an issue was actually litigated in prior proceedings. *See Nodland v. Nokota Co.*, 314 N.W.2d 89, 92 (N.D.1981). Plaintiff's claim of breach of contract was not raised nor tried in any of the previous proceedings. And the policies of finality, avoiding needless duplication, and judicial efficiency do not apply in this case. The Court therefore concludes that plaintiff's claim is not barred by res judicata.

The lease for the SW¼ of Section 11 gave defendant:

6. ... at its option ... the right and power to pool or combine the land covered by this lease, or any portion thereof, as to oil and gas, or either of them, with any other land, lease or leases when in Lessee's judgment it is necessary or advisable to do so in order to properly develop and operate said premises, such pooling is to be into a well unit or units not exceeding forty (40) acres, plus an acreage tolerance of ten per cent (10%) of

forty (40) acres, for oil and not exceeding six hundred and forty (640) acres, plus an acreage tolerance of ten per cent (10%) of six hundred and forty (640) acres, for gas, except that larger units may be created to conform to any spacing or well unit pattern that may be prescribed by governmental authorities having jurisdiction....

(Exhibit 18 of the parties' stipulated facts; see also Paragraph 7 of the same exhibit.)

■ Plaintiff's claim relates to two acts by defendant. First, defendant selected the direction of the temporary spacing units as N½–S½. Such an act may be characterized as combining leases to conform to a spacing pattern (320 acre rectangular units) established by the Commission. Thus, defendant was arguably exercising its pooling power under the lease, when it selected the direction for the spacing units. Defendant was also acting under a delegation of authority from the Commission. However, the Commission's policy of allowing an operator to choose whatever spacing direction it wanted did not completely abrogate defendant's duties under the pooling clause.

■ A review of oil and gas treatises reveals that a lessee does not have absolute discretion in exercising his pooling power, since the lessee is acting something like an agent for the lessor in binding the lessor to a certain combination of properties. Courts have discussed the limitations as the duty of fair dealing, the duty to act in good faith, and a fiduciary duty. *See, generally,* 4 H. Williams & C. Meyer, Oil and Gas Law § 670.2 at 84–86 (1981) [hereinafter cited as Williams and Meyer]; 4 Kuntz, Oil and Gas Law § 48.3 at 217–20 (1967) [hereinafter cited as Kuntz]. However, this Court agrees with the position taken in Kuntz that:

Although it has been said that the lessee has a fiduciary obligation in the exercise of the pooling power, it is submitted that the lessee is not a fiduciary and that standards applied to fiduciaries are entirely too strict. This is so because the lessee has not undertaken to manage and develop the property for the sole benefit of the lessor. The lessee has substantial interests that must be taken into account, and he should not be required to subordinate his own interests entirely to the interests of the lessor. Since his interests frequently conflict with those of his lessor, however, he must exercise the power in fairness and in good faith taking into account the interests of both the lessor and lessee.

4 Kuntz § 48.3 at 219; *see also* 4 Kuntz, Supp. for 1984. Thus, defendant's alleged intentional misrepresentation as to its choosing the spacing direction must be tested against the standard of fair dealing and good faith.

■ Second, defendant opposed a change in the temporary spacing order and appealed both the proper spacing order and the order on remand. It is difficult to characterize these acts as an exercise of the pooling power, since the Commission made the decision as to the spacing direction in those orders. They are more appropriately evaluated in terms of the implied covenant to protect against drainage or the implied covenant of reasonable development. *See Olson,* 345 N.W.2d at 41–42 n. 5. These classifications of implied obligations are not exclusive, and, at most, represent the application in two specific instances of a general duty to act fairly with respect to the lessor's rights. *See* R. Sullivan, Handbook of Oil and Gas Law 168 (1959). With either, the lessee is held to the standard of the reasonably prudent operator, giving due consideration to the interests of both lessee and lessor. *See Olson,* 345 N.W.2d at 38.

The analyses of whether defendant's actions conformed to the applicable standards converge. The good faith standard is theoretically a subjective test, but good faith must often be established by circumstantial evidence; and the conclusions arising from such evidence are

... necessarily predicated on the premise that a lessee acts in good faith when he does what a prudent operator would do under the circumstances to obtain the

greatest advantage from the operations for all parties interested in production . . .

4 Kuntz § 48.3 at 219.

Plaintiff alleges that the N½–S½ spacing for Section 11 was the product of collusion. First, it alleges that an operating agreement set the spacing direction. Defendant was a party to an operating agreement for the drilling of the Lubke well. The agreement combined leases for the W½ of Section 2, E½ of Section 3, all of Sections 10, 11 and 14. Although plaintiff offered evidence that it is common for working interest owners to agree to the spacing before drilling begins, the operating agreement contains no written specification of the spacing direction. The agreement obviously influenced the spacing directions for Sections 2 and 3, but it is not obvious that it affected the spacing direction of Section 11. See temporary spacing order, Tr.Ex. 58.

Second, plaintiff alleges that circumstances surrounding the agreement show collusion to choose N½–S½ spacing. All of the contour maps submitted by defendant showed the area covered by the operating agreement as a pooled area. See Tr.Ex. 38, 39 and 79. The map for the temporary spacing hearing did not show that M.S. Johnson had an interest, but subsequent maps did show his interest as a .68 per cent working interest in the Lubke well, beginning after the point of running production casing into the well. It is not clear what leases, if any, Johnson contributed to the agreement. Defendant contributed one of the leases for the N½ of Section 11. Plaintiff intimates that Johnson has some connection with U.V. Industries, owner of an undivided one-half interest in the minerals under the N½ of Section 11. The leases on U.V.'s interests were held by Hamilton Brothers and Wessely Oil (other parties to the operating agreement) by assignment from Frank J. Bavendick. Plaintiff's only evidence of a connection between the two is that when Jack Murphy tried to hunt down

U.V. Industries in Denver, Colorado, he eventually ended up talking to Johnson. This evidence is insufficient for the Court to conclude that collusion existed.

In addition, the Court cannot say that defendant's decision to designate the spacing N½–S½ was wholly unjustified by geological considerations. At the time of the temporary spacing hearing, only one well was drilled in the field, the Lubke well.[3] Defendant introduced one map at that hearing, which showed the Lubke well at an elevation of –8913 feet. See Tr.Ex. 38. The map also showed north-south anticlinal features with closure of the –8850 feet contour in Section 10 and closure of the –8900 feet contour in Sections 10 and 15. Plaintiff failed to show what, if anything, was wrong with the contour lines on this map, given the limited amount of data available for the field at the time. Nor did any expert testify that without doubt the map showed that the spacing should have been E½–W½. In fact, a cursory view of the map suggests that the geology of the N½ and S½ would be about the same and that the highest structures, which would have the greatest probability of yielding oil, would be in the vicinity of the E½ of Section 10.

It is apparent that defendant believed the map was reliable. Defendant drilled the second well in the field, the Murphy A, in the SE¼ of Section 10. Its third well, the Kelling was drilled in the SE¼ of Section 11, which does not appear to be the optimal spot for a subsequent well, but the Court is not privy to the well boring data from either the Lubke or Murphy A wells. The final well that defendant drilled in the field was the Murphy B–1 in the NE¼ of Section 10. This pattern of drilling suggests that defendant relied on the contour map, and it is unlikely that it would have gone to the expense of drilling, had it not believed the map was accurate.

It is also apparent that defendant believed that compensatory drainage would

---

**3.** The Murphy A might have been in the process of drilling at the time of the temporary spacing hearing. The evidence shows that it was drilled after the Lubke well and before the Kelling well.

protect correlative rights. The Lubke well was a good producer, and defendant was optimistic about the prospects for the field. Following the drilling of the Lubke Well, defendant drilled the Murphy A well, the Kelling well and the Murphy B–1 well, all of which would have resulted in royalties to plaintiff had they produced in paying quantities.

■ Since the evidence is insufficient to show that defendant's choice of temporary spacing was unjustified, the Court cannot conclude that defendant breached its duty to exercise the pooling power fairly and in good faith. Plaintiff is not entitled to recover any expenses relating to the first proper spacing hearing because of defendant's choice of temporary spacing.

Plaintiff contends that geological evidence introduced by defendant at the spacing hearings was erroneous. Its primary evidence on this point is that defendant introduced a new map at each hearing, and each map was different from the preceding map or maps. Defendant's position is that the contour maps reflect new knowledge as the field developed and as more seismic and other data was obtained.

The Court approaches analysis of these claims, keeping in mind that defendant retained the right to disagree with both the Commission and plaintiff, and that it had contractual duties with regard to its lessors on the N½ of Section 11, as well as with regard to plaintiff.

At the proper spacing hearing, defendant opposed the change in spacing direction, offering a contour map (Tr.Ex. 39) to support its position. The Commission ultimately relied on this map in its order on remand, and the Court concludes that it must have been of sufficient accuracy. Plaintiff argues that the map obviously shows desirability of N½–S½ spacing, and defendant was not acting fairly or in good faith in contesting a change in spacing. However, the contours shown on the map are subject to several different interpretations, even though the Commission had to rely on only one. Defendant's experts interpret the Kelling and Murphy A wells to

indicate general southerly dip. Plaintiff's expert interprets them to suggest southeasterly dip into the SE¼ of Section 11 and southwesterly dip into the SE¼ of Section 10. Defendant's experts also placed greater weight on inferences from the drilling of the Murphy B–1, which was not shown on Tr.Ex. 39, since it was not completed at the time of the July 24, 1979, hearing. The Court concludes that these are normal variations in interpretation. Defendant's interpretation was not so far off as to indicate bad faith or unfairness.

At the hearing on remand, defendant again challenged the E½–W½ spacing, and offered a third contour map (Tr.Ex.79). This exhibit shows contour lines different from those in either Tr.Ex. 38 or 39. Defendant argues that this change was justified by two new seismic lines obtained after the July 24, 1979, proper spacing hearing and before the hearing on remand. Neither transected the SW¼ of Section 11. Approximately eight seismic lines previously acquired by defendant were reprocessed during that time. Plaintiff failed to show that the seismic lines or contour lines were inaccurate.

Tr.Ex. 79 also shows the Lubke well at an elevation 12 feet higher from what it was shown on defendant's previous maps. The Murphy A is shown eight feet higher and the Kelling well, 13 feet higher. Plaintiff's own expert, Jack Wilborn, a geologist, testified that a 12 foot error in plotting the elevation of a well would not make a big difference in evaluating the structure of a field. The exhibit also has the Murphy A located in the north of the SE¼ of Section 10 instead of the south of that quarter, where it is actually located, an error of over 660 feet. Wilborn testified that he has seldom seen a developer plot the surface location of a well with inaccuracies of 660 feet or more. It is not clear whether the error works in plaintiff's favor or against it. However, the misplotting was noted at the hearing on remand, and plaintiff's geologist at the hearing gave an opinion based on Tr.Ex. 39, after choosing a

different "top of the pick" [4]. His interpretation of the closure of the –8925 feet contour differed significantly from the interpretation of defendant's experts at the hearing. His interpretation pulled that contour south, substantially into the SW¼ of Section 11. Defendant's experts interpret it to close further north, cutting diagonally into the upper northeast corner of the SW¼. In the end, the Commission chose to rely on Tr.Ex. 39, which had been introduced at the proper spacing hearing, rather than any of the exhibits introduced at the hearing on remand.

At plaintiff's request, the state attorney general's office investigated the testimony of one of defendant's experts at the hearing on remand, Howard Sahl, a geophysicist. The focus of the investigation was the seismographic lines used to establish the contours on Tr.Ex. 79. Nothing ever came of the investigation. The state attorney general's opinion of Sahl's conduct is not binding on this Court. However, this Court can only conclude that the errors in Tr.Ex. 79 were not so great as to suggest deliberate misrepresentation. Nor can it conclude that defendant's interpretation of the geological evidence was clearly erroneous or unfair to plaintiff.

Finally, plaintiff argues that defendant knowingly misrepresented that the N½ and S½ of Section 11 were subject to express or implied voluntary pooling agreements. This representation was not made at any of the spacing hearings, but was made only in defendant's brief for the appeal from the proper spacing order. Defendant later admitted that no such agreements existed. The transcript of the hearing on remand suggests that defendant made the representation because of a good faith but mistaken belief that such agreements did exist.

 The Court concludes that defendant did not breach any duty of fair dealing. Even if it were to reach the opposite conclusion, plaintiff has failed to meet its burden of proof with respect to the causal link between defendant's conduct and plaintiff's claimed damages.

## COUNT THREE: ACCOUNTING FOR THE LUBKE AND KELLING WELLS

The parties have not presented their full evidence on plaintiff's demand for an accounting as to the production, profits and royalties from the Lubke and Kelling wells. The limited proof offered at trial suggested that defendant set up a receiving company at the well head to which it sold the oil at a reduced price. It also suggested that there was a dispute as to what costs were to be collected from the mineral owners and whether the royalties paid were based on the price agreed upon in the lease. The Court finds that the accounting issue is still open and resolution of this count shall proceed as ordered in the Order of February 24, 1984, before a special master.

## CONCLUSION

For the above reasons, IT IS ORDERED:

1. That the Clerk shall enter judgment in favor of defendant as to Counts One and Two of the Amended Complaint. Each party shall bear its own costs and disbursements.

2. That the accounting schedule set out in the Order of February 24, 1984, is confirmed. If trial on the issue of the accounting is necessary, a special master for that purpose will be appointed on June 24, 1984.

---

**4.** "Top of the pick" was used at trial to mean the top of the Duperow, as the structure of the field was interpreted by a geologist. In other words, it is the high point of a pool. See Tr. p. 131.