AMOCO PRODUCTION COMPANY, William C. Lubke and Evelyn G. Lubke, Plaintiffs and Appellants,

v.

NORTH DAKOTA INDUSTRIAL COMMISSION; and the First National Bank and Trust Company of Williston, Trustee of Murphy Land Trust, Defendants and Appellees.

Civ. No. 9934.

Supreme Court of North Dakota.

June 30, 1981.

Fleck, Mather, Strutz & Mayer, Bismarck, for plaintiff and appellant Amoco Production Co.; appearance by Jane Fleck Romanov, Bismarck.

Greenwood, Greenwood & Greenwood, Dickinson, for plaintiffs and appellants William C. Lubke and Evelyn G. Lubke; argued by Dann E. Greenwood, Dickinson.

Owen L. Anderson, Asst. Atty. Gen., UND School of Law, Grand Forks, for de-

fendant and appellee North Dakota Industrial Commission.

Reichert, Howe, Hardy, Galloway & Jorgensen, Dickinson, for defendant and appellee First Nat. Bank and Trust Co. of Williston, Trustee of Murphy Land Trust; argued by Albert J. Hardy, Dickinson.

ERICKSTAD, Chief Justice.

The appellants, Amoco Production Company and the Lubkes, appeal from a judgment of the District Court of Burleigh County affirming a spacing order of the North Dakota Industrial Commission. Amoco moved to dismiss the appeal. The Lubkes opposed the motion. We grant the motion of appellant Amoco Production Company to dismiss its appeal and affirm the judgment of the district court affirming the order of the Industrial Commission.

This case first arose from a hearing held July 24, 1979, before the North Dakota Industrial Commission to consider the proper spacing of oil and gas wells for the development of the Rattlesnake Point Field in the Duperow Pool in Dunn County, North Dakota. Prior to this hearing, the Commission had established a temporary 320–acre spacing pattern for the pool. The 320 acres were to consist of two adjacent quarter sections within the same section. At the time Amoco had completed a successful well in the northwest quarter of section 11 of township 145 north, range 96 west, they had the option of selecting either laid-down (north half-south half) or stand-up (east half-west half) spacing. Amoco chose laid down spacing.

The Lubkes have an undivided one-half interest in the north one-half of section 11. Murphy Land Trust owns the mineral interest in the southwest quarter of section 11; the southeast quarter is not in issue. The royalty on production from the Lubke well, the well in the northwest quarter of section 11, was paid to the owners of the mineral interests in the north one-half of section 11.

The Kelling well was subsequently drilled by Amoco in the southeast quarter. This well was a poor producer and testimony was received that it was probably located low on the reservoir structure. The royalty on the production from this well was allocated to the owners of the south half of section 11. After a July 24, 1979, hearing, the Commission determined that the spacing should have been the east one-half and west one-half rather than north one-half and south one-half.

The Commission also ordered:

"(13) That for the purposes of division of production to owners of interests in spacing units established herein, this order shall be effective at 7:00 a. m. on the 1st day of September, 1979."

Amoco and the Lubkes appealed the order to the district court asserting that the Commission erred by spacing section 11 east one-half and west one-half, that there was insufficient notice to the Lubkes, that the Commission was without jurisdiction to change the spacing after such spacing had been established by contract between the owners of the interests,[1] and that the Commission could not provide a date for allocation of production in a spacing order. The district court remanded the Commission's order "for the purpose of making such findings as are necessary with respect to the question of correlative rights, and, in this connection, to give interested parties an opportunity to hear and submit such evidence as may be relevant in connection with that subject." As the proceedings were remanded, the district court did not address whether or not the notice of hearing was adequate.

A hearing on remand was held May 20, 1980, before the Commission. The Lubkes and their counsel were present at the hearings as were Amoco and a representative of the Murphy Trust. More information concerning the shape of the pool was introduced at this hearing. Thereafter, the Commission made the following relevant findings:

"(4) That due to errors in Amoco's exhibit # 1, a structure map contoured on

---

1. It was later admitted that there was no contract regarding spacing or any voluntary pooling agreement.

the top of the Duperow Formation, the validity of the exhibit is questionable.

"(5) That the Amoco Production # 1 Kelling, located 3,300 feet from the north line and 660 feet from the east line of Section 11, Township 146 North, Range 96 West, Dunn County, North Dakota, initially produced 26 barrels of oil per day, and through March 1, 1980 had a cumulative production of 16,647 barrels of oil; that the Amoco Production # 1 Lubke, located 2,010 feet from the north line and 660 feet from the west line of Section 11, Township 146 North, Range 96 West, Dunn County, North Dakota, had an initial production of 531 barrels of oil per day, and through March 1, 1980, had a cumulative production of 165,909 barrels of oil; that this indicates that the reservoir characteristics in the area of the Lubke # 1 well, located in the W/2 of Section 11, are far superior to the reservoir characteristics in the area of the Kelling # 1 well, located in the E/2 of Section 11.

"(6) That, assuming radial drainage, the W/2 of said Section 11 will contribute more oil to the total ultimate recovery of the Lubke # 1 well than will the N/2 of the section.

"(7) That in order to protect correlative rights the W/2 of said Section 11 should be designated the spacing unit for the Lubke # 1 well, and the E/2 of said Section 11 should be designated the spacing unit for the Kelling # 1 well."

In addition the Commission affirmed its previous order which ordered the stand-up spacing and set the allocation date.

The Lubkes and Amoco appealed from the second order of the Commission to the district court, asserting that the east half—

west half spacing of section 11 was contrary to the weight of the evidence and that the Commission could not set an effective date for allocation of production in a spacing order. The district court affirmed the Commission's order, and Amoco and the Lubkes appealed to this court, asserting that the district court erred in affirming the Commission's order in that it was not sustained by substantial and credible evidence and that it was error to set an effective date for allocation of production in such a spacing order.

Before the hearing in our court, Amoco filed a motion to dismiss its appeal; the Lubkes opposed it and it was heard at the same time as the Lubkes' appeal was heard.

### I. Motion to Dismiss

The Lubkes opposed the motion contending that they would be prejudiced as they relied upon the brief submitted by Amoco to address the issue of the allocation date. During oral argument, counsel for the Lubkes said he would not oppose Amoco's motion if he were permitted to rely on Amoco's brief. This was agreeable to counsel for the Commission and the Murphy Trust. Accordingly, we grant the motion of Amoco to dismiss its appeal.

### II. Standard of Review

■ The standard of review of the district court in reviewing the orders of the Commission is set out in Section 38–08–14(4) of the North Dakota Century Code.[2] This is a specific statute dealing with appeals from the Industrial Commission. The standard of review found in Chapter 28–32, N.D.C.C., the Administrative Agencies Practice Act, is therefore not applicable in this case. See § 1–02–07, N.D.C.C.[3]

---

2. "4. The district court shall, insofar as is practicable, give precedence to appeals from orders of the commission. Upon the appeal of such an order the district court shall review the proceedings before the commission as disclosed by the transcript upon appeal, and thereafter enter its judgment affirming or reversing the order appealed. Orders of the commission shall be sustained if the commission has regularly pursued its authority and its findings and conclusions are sus-

tained by the law and by substantial and credible evidence." § 38–08–14(4), N.D.C.C.

3. "1–02–07. Particular controls general.— Whenever a general provision in a statute shall be in conflict with a special provision in the same or in another statute, the two shall be construed, if possible, so that effect may be given to both provisions, but if the conflict between the two provisions is irreconcilable the special provision shall prevail and shall be construed as an exception to the general provision,

Thus, the district court shall sustain the orders of the Commission if it "has regularly pursued its authority and its findings and conclusions are sustained by the law and by substantial and credible evidence." § 38-08-14(4), N.D.C.C. The "substantial evidence" test was the test employed in reviewing all administrative agency orders prior to 1977 when the Legislature amended Section 28-32-19 adopting the "preponderance of the evidence" test. Hence, our prior case law applying the substantial evidence rule is applicable. *Tenneco Oil Co. v. State Industrial Commission*, 131 N.W.2d 722, 724 (N.D.1964).

In *Bank of Hamilton v. State Banking Bd.*, 236 N.W.2d 921 (N.D.1975), a case involving another administrative agency, we said:

"Our review of the factual basis of administrative agency orders is a three-step process: (1) Are the findings of fact supported by substantial evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law? [Citations omitted.]

\* \* \* \* \* \*

"This court, however, has indicated its reluctance to substitute its own judgment for that of qualified experts in matters entrusted to administrative agencies." 236 N.W.2d at 925.

unless the general provision shall be enacted later and it shall be the manifest legislative intent that such general provision shall prevail." § 1-02-07, N.D.C.C.

4. *"Correlative rights*
'[T]he opportunity afforded, so far as it is practicable to do so, to the owner of each property in a pool to produce without waste his just and equitable share of the oil or gas, or both, in the pool; being an amount, so far as can be practically determined, and so far as can practicably be obtained without waste, substantially in the proportion that the quantity of recoverable oil or gas, or both, under such property bears to the total recoverable oil or gas, or both, in the pool, and for such purposes to use his just and equitable share of the reservoir energy.' Nev.Rev.Stat. § 522.020(2). There appear to be two aspects of the doctrine of correlative rights: (1) as a corollary of the rule of capture, each person has a right to

In *Citizens State Bank of Neche v. Bank of Hamilton*, 238 N.W.2d 655 (N.D.1976), we said:

"We have defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' [Citations omitted.] '[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' [Citations omitted.] This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. [Citation omitted.]" 238 N.W.2d at 660.

Pursuant to this standard we must decide whether or not there was substantial evidence to support the Commission's conclusion that the spacing should be east half—west half rather than north half—south half.

### III. Order Designating Spacing Pattern

The Lubkes assert that "the order of the Commission is not sustained by substantial or credible evidence." Only that part of the order relating to the spacing pattern is seriously contested.

■ The Commission is charged with the authority to set spacing units "[w]hen necessary to ... protect correlative rights." [4] § 38-08-07, N.D.C.C.[5]

produce oil from his land and capture such oil or gas as may be produced from his well, and (2) a right of the land owner to be protected against damage to a common source of supply and a right to a fair and equitable share of the source of supply. When a legislature or administrative body regulates production practices to protect against waste, it may also regulate to insure an equitable distribution of the source of supply. There is some dispute over the power of the state to regulate production practices to insure an equitable distribution of the source of supply, apart from waste. See *Treatise* § 204.-6." Williams & Meyer, Manual of Oil & Gas Terms (4th ed. 1976).

5. *"38-08-07. Commission shall set spacing units.* The commission shall set spacing units as follows:
1. When necessary to prevent waste, to avoid the drilling of unnecessary wells, or to protect correlative rights, the commission

This power is a continuing duty. §§ 38–08–07(4) and 38–08–09.2, N.D.C.C.[6] The Commission has the power and authority to modify the spacing units whenever it is necessary to prevent waste or avoid the drilling of unnecessary wells, or to protect correlative rights. § 38–08–07(4), N.D.C.C.

The Lubkes were not present at the July 24, 1979, hearing. They claim that this was due to inadequate notice. We agree with the district court that such absence was immaterial as that order of the Commission was remanded and the Lubkes were present at the May 20, 1980, rehearing and were given an opportunity to introduce evidence and examine witnesses.

> shall establish spacing units for a pool. Spacing units when established shall be of uniform size and shape for the entire pool, except that when found to be necessary for any of the purposes above mentioned, the commission is authorized to divide any pool into zones and establish spacing units for each zone, which units may differ in size and shape from those established in any other zone." § 38–08–07(1), N.D.C.C.

**6.** *"38–08–09.2. Power and authority of commission.* The commission is hereby vested with continuing jurisdiction, power and author-

At the rehearing, Mr. William Lubke was called as a witness but did not testify as to the geological formations or shape of the structure from which the Lubke and Kelling wells were producing. Rather, the Lubkes rely entirely upon the evidence introduced by Amoco at the hearings.

At the July 24, 1979, hearing (first hearing), Amoco introduced Exhibit # 1, asserting it to be their interpretation of the producing structure in the Top Devonian Duperow Formation [Map I]. It shows an anticlinal nose with open contour lines to the south:

> ity, including the right to describe and set forth in its orders all those things pertaining to the plan of unitization which are fair, reasonable, and equitable and which are necessary or proper to protect, safeguard, and adjust the respective rights and obligations of the several persons affected, and it shall be its duty to make and enforce such orders and do such things as may be necessary or proper to carry out and effectuate the purposes of sections 38–08–09.1 through 38–08–09.16, N.D.C.C." § 38–08–09.2, N.D.C.C.

MAP I

This exhibit shows the Lubke well in the northwest quarter of section 11, the Kelling well in the southeast quarter of section 11, and the dry hole in the southeast quarter of section 10. The testimony at the May 20, 1980, rehearing reveals that the Murphy dry hole in the southeast quarter of section 10 was misplaced on this exhibit and should have been placed further south in the southwest quarter of the southeast quarter of section 10 rather than in the northwest quarter of the southeast quarter of section 10.

At the rehearing, Amoco offered another interpretation of the same field [Map II]. This exhibit discloses contour lines closed to the south:

MAP II

This exhibit was based partially upon the drilling of the Murphy Unit B well in the northeast quarter of section 10 which is structurally higher on the Duperow Formation than the Lubke well. Howard L. Sahl, a petroleum geologist employed by Amoco, testified that this indicated to him that the structure contours should be closed and that the formation would run in an east-west direction. On direct examination, Mr. Sahl testified that there could be an interpretation which would leave the contours open to the south. Mr. Sahl testified that the structure diagrams had changed at each hearing due to new information. The new information was, (1) the Murphy Unit B in the northeast quarter of section 10 which indicated to Mr. Sahl an east-west formation which would drain more from the Lubke's northeast quarter of section 11 than from

the Murphy's southwest quarter, and (2) additional seismic work.[7]

A consulting geologist for the Commission, Steven Harris, testified that he thought the evidence submitted by Amoco still supported a north-south spacing. He testified that stand-up spacing would best protect correlative rights. Mr. Harris drew

in an additional contour line between the −8950 and −8900 contour lines placed by Amoco. Map III is the same map as map II which was submitted by Amoco, except the contour representing −8925 was drawn in by Mr. Harris on map III and by Mr. Sahl on map II. See map III compared to the line drawn by Mr. Sahl between these contour lines in map II:

---

**7.** The Commission and Murphy Trust question whether or not there has been any additional seismic activity as there is no record in the office of the Register of Deeds of Dunn County of any drilling permits for seismic activity obtained by Amoco for the area in question, and one of the owners of the mineral interest was not aware of any such activity being conducted since the completion of the well.

MAP III

After the rehearing, the Commission found "(4) [t]hat due to errors in Amoco's exhibit # 1 [Map II], a structure map contoured on the top of the Duperow Formation, the validity of the exhibit is questionable."

Both of Amoco's experts agreed with the concept of radial drainage.[8] Mr. Sahl testified at the rehearing as follows:

"*MR. SAHL*: Well, I would agree that generally speaking drainage is radial, if the reservoir conditions are curved rather

8. The concept of radial drainage is that a well will drain the reservoir in a circular pattern consisting of an equal radius around the well hole. Radial drainage is assumed unless there is proof that due to the location of the well on the structure, it drains from one direction more than another.

uniformily, then the drainage should be generally radial.

"*MR. HARDY*: And is that not the case here?

"*MR. SAHL*: From the wells, well information I would say that the reservoir is fairly uniform throughout the area.

"*MR. HARDY*: And accordingly we have a radial drilling, or radius drainage pattern?

"*MR. SAHL*: It's possible."

Mr. R. B. Giles also testified at the rehearing as follows:

"*MR. HARDY*: Do you agree with the concept of radial drainage.

"*MR. GILES*: We, as reservoir engineers, must assume radial drainage, absent of proof beyond a reasonable doubt as to particular directional permeability in the reservoir.

"*MR. HARDY*: All right, and on that basis and based on the information you have, drainage is occurring from the southwest ¼ of section 11?

"*MR. GILES*: Some drainage yes."

The finding of the Commission that Amoco's exhibit [Map II] was of questionable value is supported by the following facts: (1) Amoco had drawn three different contour maps with the one presented at the rehearing being substantially different from the others. (2) Amoco misplaced the Murphy Unit A well. (3) All the experts testified that the Lubke well was draining the southwest quarter of section 11. (4) Radial drainage is presumed unless rebutted, and there is little evidence to rebut it.

The Lubke well is located in the southwest quarter of the northwest quarter of section 11. The Kelling well is located in the northeast quarter of the southeast quarter of section 11. Amoco's expert testified that "absent . . . proof beyond a reasonable doubt as to particular directional permeability in the reservoir" radial drainage must be assumed. As no such proof was submitted, the facts support the following finding of the Commission:

"(6) That, assuming radial drainage, the W/2 of said Section 11 will contribute more oil to the total ultimate recovery of the Lubke # 1 well than will the N/2 of the section."

The Lubkes assert in their brief that the Commission has selectively relied on some of the evidence introduced by Amoco and discredited and rejected other evidence. They say:

"In the first place it is a well recognized principle in law that, as otherwise stated, 'you can't have your cake and eat it too'. The Commission in reading its decision, has not had the benefit of any sufficient or credible evidence from any source other than Amoco. Yet its counsel asserts that the Commission's ruling is supported by Amoco's own evidence while at the same time attacking the less favorable aspects thereof as 'not credible'. It hardly seems right in the law that the Commission should be allowed to pick and choose as it pleases."

■ This asserted "well recognized principle in law" has no application to the present case. The Commission may accept evidence it deems credible and reject evidence it deems incredible regardless of the fact that it may all be submitted by the same party. As the evidence did not establish any drainage other than radial drainage, and radial drainage is presumed, the Commission relied upon this theory, a theory recognized by Amoco, and concluded that a well draining in a radial pattern will drain more oil and gas from its immediate area than from a tract further away. In so doing, the Commission acted properly to protect correlative rights by ordering stand-up spacing. Accordingly, that part of the Commission's order is affirmed.

### IV. Allocation Date

The Lubkes also assert that "[t]he Commission may not by virtue of a spacing order designate the effective date for allocation of production."

■ The Lubkes rely upon the brief submitted by Amoco concerning this issue. In its brief "Amoco asserts that by designating the date for the allocation of production in a spacing order the Commission has effectively pooled the separately owned interests included in the spacing unit without the

benefit of a pooling agreement or regulatory order." This issue, however, was never brought before the Commission when it conducted the rehearing. The allocation date was set in the order of the Commission pursuant to the first hearing in 1979. The order pursuant to the rehearing in 1980 made additional findings of fact and affirmed the first order containing the allocation date. Ordinarily the issues considered by a reviewing court are confined to issues raised before the agency, in this case the Commission. *Petition of Village Board of Wheatland*, 77 N.D. 194, 42 N.W.2d 321, 335 (1950).

In *Schank v. North American Royalties, Inc.*, 201 N.W.2d 419 (N.D.1972), we recognized that pooling and spacing were separate concepts and that "[a] spacing order standing alone without a pooling order does not operate as a defacto pooling of all fractional interests ..." 201 N.W.2d at 422. *See also* §§ 38–08–07 and 38–08–08, N.D. C.C.[9]

In this case, the Commission asserts it set a date for allocation of the production to the royalty owners, "as a courtesy to Amoco so as to give Amoco advance notice of when the redesignation of the spacing units in Section 11 would become effective for purposes of reallocating production royalties."

Applying the general rule earlier stated herein, we conclude that the issue of allocation as an item of pooling is not before us in this appeal.

The judgment of the district court and, accordingly, the order of the Commission are affirmed.

SAND, PAULSON and PEDERSON, JJ., and JAMES K. O'KEEFE, District Judge, concur.

O'KEEFE, District Judge, sitting in place of VANDE WALLE, J., disqualified.

---

9. "38–08–08. *Integration of fractional tracts.*

"1. When two or more separately owned tracts are embraced within a spacing unit, or when there are separately owned interests in all or a part of the spacing unit, then the owners and royalty owners thereof may pool their interests for the development and operation of the spacing unit. In the absence of voluntary pooling, the commission upon the application of any interested person shall enter an order pooling all interests in the spacing unit for the development and operations thereof. Each such pooling order shall be made after notice and hearing, and shall be upon terms and conditions that are just and reasonable, and that afford to the owner of each tract or interest in the spacing unit the opportunity to recover or receive, without unnecessary expense, his just and equitable share. Operations incident to the drilling of a well upon any portion of a spacing unit covered by a pooling order shall be deemed, for all purposes, the conduct of such operations upon each separately owned tract in the drilling unit by the several owners thereof. That portion of the production allocated to each tract included in a spacing unit covered by a pooling order shall, when produced, be deemed for all purposes to have been produced from such tract by a well drilled thereon." § 38–08–08(1), N.D.C.C.