**Dallas HYSTAD and Phylis A. Hystad, Appellees,**

v.

**INDUSTRIAL COMMISSION of the State of North Dakota in the Matter of the Proper Spacing for the Development of the Poe-Red River, McKenzie County, North Dakota, and Exeter Exploration Company, Appellants.**

**Civ. No. 11044.**

Supreme Court of North Dakota.

June 19, 1986.

Rolfstad, Winkjer, McKennett & Stenehjem, Williston, for appellees; argued by Kent Reierson. Appearance by Dean Winkjer.

Lawrence Bender, Asst. Atty. Gen., North Dakota Indus. Com'n, State Capitol, Bismarck, for appellant Industrial Com'n of the State of N.D.

Fleck, Mather, Strutz & Mayer, Bismarck, for appellant Exeter Exploration Co.; argued by John W. Morrison.

MESCHKE, Justice.

The Industrial Commission of North Dakota (Commission) and Exeter Exploration Company (Exeter) appeal from a district court judgment reversing in part a Commission order establishing spacing units in the Poe-Red River Pool. The issues relate to the Commission's statutory authority to order different size spacing units for a pool when it enters its initial order establishing proper spacing, and whether an order for such spacing units was supported by substantial and credible evidence. We conclude that the Commission has the authority to order different size spacing units for a pool in its initial proper spacing order when necessary to prevent waste, to avoid the drilling of unnecessary wells, or to protect correlative rights. Within the exercise of its administrative judgment, however, the Commission must satisfactorily explain why different size spacing units are necessary to accomplish one or more of those objectives. Because the Commission has not satisfactorily explained its decision, we reverse and remand for further proceedings.

The Poe-Red River Pool underlies seven sections of land in McKenzie County, North Dakota.[1] In late 1981 and early 1982, three wells were drilled[2] in the pool. Pursuant to Section 43-02-03-18(3), N.D.A.C.,[3]

---

1. The Poe-Red River Field was defined as the following tracts of land in McKenzie County:
   "*TOWNSHIP 152 NORTH, RANGE 99 WEST, 5TH PM* ALL OF SECTION 31.
   "*TOWNSHIP 152 NORTH, RANGE 100 WEST, 5TH PM* ALL OF SECTIONS 35 AND 36.
   "*TOWNSHIP 151 NORTH, RANGE 100 WEST, 5TH PM* ALL OF SECTIONS 1, 2, 10 AND 11."
   The Poe-Red River Pool was defined as the accumulation of hydrocarbons found below the base of the Stony Mountain Formation and above the top of the Winnipeg Formation within the limits of the field.

2. The Hystad 11-31 well was spudded on July 5, 1981, in Section 31, Township 152 North, Range 99 West and was completed in November 1981. The Hystad 15-2 well was spudded on September 18, 1981, in Section 2, Township 151 North, Range 100 West and was completed in February 1982. The State 16-36 well was spudded on December 5, 1981, in Section 36, Township 152 North, Range 100 West and was completed in March 1982.

3. Section 43-02-03-18(3), N.D.A.C., provides:
   "3. Within thirty days after the discovery of oil or gas in a pool not then covered by an order of the commission, a spacing hearing shall be docketed. Following such hearing the commission shall issue an order prescribing a temporary spacing pattern for the development of the pool. This order shall continue in force for a period of not more than eighteen months at the expiration of which time a hearing shall be held at which the commission may require the presentation of such evidence as will enable the commission to determine the proper spacing for the pool. "During the interim period between the discovery and the issuance of the temporary order no permits shall be issued for the drilling of an offset well to the discovery well, unless approved by the enforcement officer. Approval shall be consistent with anticipated spacing for the orderly development of the pool.
   "Any well drilled within one mile [1.61 kilometers] of an established field shall conform to the spacing requirements in that field except when it is apparent that the well will not produce from the same common source of supply. In order to assure uniform and orderly development, any well drilled within one mile [1.61 kilometers] of an established field boundary shall conform to the spacing and special field rules for the field, and for

the Commission entered an order, dated April 13, 1982, establishing temporary spacing units of 640 acres for the pool. The Commission held a hearing to consider proper spacing on November 22, 1983. Because there was insufficient reservoir and production data from the three wells to establish proper spacing, the Commission continued the temporary order. Following a hearing on July 9, 1984, the Commission entered an order, dated July 19, 1984, establishing proper spacing for the pool at 320 acres for the four sections without existing wells and 640 acres with a second allowable well for the three sections with existing wells. (*See* fn. 2).

Dallas and Phylis Hystad[4] petitioned the Commission for a rehearing, asserting that the Commission overlooked certain statutory spacing provisions and that there was no evidence to support the Commission's decision for 640-acre spacing units on the three sections with existing wells. Following a rehearing at which the issues were briefed and argued but no additional evidence was presented, the Commission entered an order, dated October 17, 1984, affirming its July 19 order.

The Hystads appealed the Commission's order to district court and Exeter was permitted to intervene. The district court reversed the part of the order establishing spacing units of 640 acres with a second allowable well on the three sections with existing wells and entered a judgment establishing 320-acre spacing units for the entire seven section pool. Exeter and the Commission appealed.

■ The standard of review on appeals from an order of the Commission is specifically provided in Section 38–08–14, N.D. C.C., and requires affirmance if (1) the Commission has regularly pursued its authority, and (2) the Commission's findings

and conclusions are sustained by the law and by substantial and credible evidence. *Amoco Production Co. v. North Dakota Indus. Comm'n,* 307 N.W.2d 839 (N.D. 1981), where we also said:

" 'Our review of the factual basis of administrative agency orders is a three-step process: (1) Are the findings of fact supported by substantial evidence? (2) Are the conclusions of law sustained by the findings of fact? (3) Is the agency decision supported by the conclusions of law? [Citations omitted.]

\* \* \* \* \* \*

" 'This court, however, has indicated its reluctance to substitute its own judgment for that of qualified experts in matters entrusted to administrative agencies.'

\* \* \* \* \* \*

" 'We have defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [Citations omitted.] "[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." [Citations omitted.] This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. [Citation omitted.]' " 307 N.W.2d at 842.

■ The Hystads contend that insofar as the Commission's proper spacing order retained 640-acre spacing units with a second allowable well on the three sections of land, the order was not authorized by law. The Hystads' argument is premised on defining a "zone" as a "stratigraphic interval"[5] and

the purposes of spacing and pooling, the field boundary shall be extended to include the spacing unit for such well and any intervening lands. The foregoing shall not be applicable if it is apparent that the well will not produce from the same common source of supply as wells within the field."

4. The Hystads hold mineral interests on parts of two sections on which two of the existing wells are located.

5. The Hystads rely on the following definition of "zone" in 8 Williams and Meyers, *Oil and Gas,* pp. 984–985 (1984).

the language of Section 38–08–07(1), N.D. C.C., that spacing units be of uniform size and shape throughout the pool unless the Commission divides the pool into "zones" and establishes spacing units of differing size and shape for each "zone." The Hystads contend that because there was no evidence of different stratigraphic intervals in the Poe-Red River pool, there was no basis for spacing units of a non-uniform size or shape.

Exeter and the Commission assert that the term "zone" as used in Section 38–08–07(1), N.D.C.C., refers to geographic area rather than stratigraphic interval.

Section 38–08–07, N.D.C.C., deals with the Commission's authority to set spacing units and provides in subdivision (2) that "the size and shape of spacing units are to be such as will result in the efficient and economic development of the pool as a whole."

The standard for uniform size and shape spacing units is provided in Section 38–08–07(1), N.D.C.C.:

"1. When necessary to prevent waste, to avoid the drilling of unnecessary wells, or to protect correlative rights, the commission shall establish spacing units for a pool. *Spacing units when established shall be of uniform size and shape for the entire pool, except that when found to be necessary for any of the purposes above mentioned, the commission is authorized to divide any pool into zones and establish spacing units for each zone, which units may differ in size and shape from those established in any other zone.*" [Emphasis added.]

The standard of a reasonably uniform spacing plan throughout the pool is also re-

peated in Sections 38–08–07(3) and (4), N.D. C.C.

The plain language of that statute authorizes the Commission to deviate from spacing units of uniform size and shape only when it finds that such a deviation is necessary to prevent waste, to avoid drilling unnecessary wells, or to protect correlative rights. The existence of different stratigraphic intervals is not a statutory requirement for the Commission to order different size or shape spacing units. The context of the language authorizes the Commission to divide a pool into geographic zones. If a zone were interpreted as a stratigraphic interval, the Commission would have the authority to divide a pool into stratigraphic intervals. However, a stratigraphic interval exists because of the geologic composition of the earth, and the Commission cannot create a stratigraphic interval if it does not exist because of the earth's geologic composition.

We also note that the legislative history supports this interpretation of the term "zone" as referring to a geographic area in this context. Section 38–08–07, N.D.C.C., is part of North Dakota's law for the conservation of oil and gas and was originally enacted in 1953. 1953 N.D.Sess. Laws, Ch. 227, § 8. The legislative materials relating to the enactment of Chapter 38–08, N.D.C.C., state that it was based upon "the model act prepared by the Interstate Oil Compact Commission with amendments up to 1951." 1953 Report of Legislative Research Committee, Senate Bill 32, p. 66. The materials available to the 1953 Legislature included an article discussing the model act. Walker, *Discussion: A Model Oil and Gas Conservation Law*, 26 Tul.L.Rev. 267 (1952). As pertinent to the Commis-

---

"This term was defined by the Seeligson Field Unit Agreement as 'a stratigraphic interval containing one or more reservoirs.' See Myers, *The Law of Pooling and Unitization* 104 (1957).

"30 La.R.S. 1950 § 9(E)(as amended in 1980) provides:

" 'Each zone of a general structure which is completely separated from any other zone in

the structure is covered by the term "pool", to promote the development and production of marginally commercial sands, a zone may contain one or more common accumulations and the overall stratigraphic intervals of the zone may be considered and treated as a pool."

sion's authority to establish spacing units, that article provides:

"The requirement that spacing units must be of uniform size and shape for 'the pool as a whole' favors the correlative rights doctrine. On the other hand, a strict 'uniform size and shape' requirement might unduly burden an owner if his property or lease is not advantageously located on the structure or should happen to be in the gas-cap area of an oil pool. *Recognizing these probabilities, the Model Act provides that the regulatory body may zone the area of the pool and establish spacing units of uniform size and shape within each zone.* Thus, spacing of a pool becomes a flexible tool for carrying out the purposes of the Act.

"The Model Act also permits the regulatory body to consider the fact that spacing units for a gas-cap zone should be larger than for an oil zone. Under the act other bases for zoning, such as pay sand thickness or recoverable hydrocarbons in place, may also be used. Generally, spacing units are now established by regulatory bodies after considering testimony concerning *average* information about the pool as a whole. The testimony on spacing is generally designed to prove the expected recovery of oil or gas from an average unit of pool volume. The spacing units on the fringes of the pool often do not contain the average amount of pool volume. The result, particularly in states adhering to flat per-well allowables, is excessive and disproportionate withdrawals and discrimination in favor of wells drilled on spacing units underlaid by the thinner pay sections. *With authority to zone a pool, the regulatory body can, and no doubt would, eliminate this violation of correlative rights by providing closer spacing in areas of maximum pay sand thickness and wider spacing in areas of thinner pay sand thickness.*" [Emphasis added.] Walker, *Discussion: A Model Oil and Gas Conservation Law, supra,* at 283.

This discussion recognizes the authority of the Commission to zone an "area" of the pool and establish uniform size and shape spacing units within each zone and, further, that that type of spacing is a flexible tool for carrying out the purposes of the Act and, in particular, protecting correlative rights.[6]

We believe that, within the context of the language of Section 38–08–07(1), N.D.C.C., the Commission has the authority to divide a pool into geographic areas (*i.e.,* zone a pool) for non-uniform spacing units when necessary to prevent waste, avoid drilling unnecessary wells, or to protect correlative rights.

The Commission and Exeter contend that, pursuant to Section 38–08–07(4), N.D.C.C., a temporary spacing order is an "order" which may be modified by allowing two wells on a spacing unit. The Hystads contend that Section 38–08–07(4), N.D.C.C., applies only to modification of a proper spacing order, and that, when it enters a proper spacing order, the Commission may not order an additional well on a spacing unit that was established by a temporary spacing order.

Section 38–08–07(4), N.D.C.C., provides:

"4. An order establishing units for a pool shall cover all lands determined or believed to be underlaid by such pool, and may be modified by the commission from time to time to include additional areas determined to be underlaid by such pool. *When found necessary for the prevention of waste, or to avoid the drilling of unnecessary wells, or to protect*

---

6. The purposes of the Act are stated in the declaration of policy in Section 38–08–01, N.D.C.C., which provides, in part:

"38–08–01. *Declaration of policy.* It is hereby declared to be in the public interest to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas be had and that the correlative rights of all owners be fully protected; ..."

*correlative rights, an order establishing spacing units in a pool may be modified by the commission to increase or decrease the size of spacing units in the pool or any zone thereof, or to permit the drilling of additional wells on a reasonably uniform plan in the pool, or any zone thereof, or an additional well on any spacing unit thereof."* [Emphasis added.]

■ Upon discovery of oil or gas in a pool not covered by a spacing order, the Commission may enter an order for temporary spacing for the development of the pool. Section 43–02–03–18(3), N.D.A.C.[7] *See* fn. 3. The temporary spacing order continues in force for not more than 18 months, and, at the expiration of that time, the Commission must hold a proper spacing hearing and thereafter enter a proper spacing order. *Id.* A temporary spacing order permits the orderly development of the pool during the time it is in effect and is an integral part of the Commission's duties to prevent waste, to avoid the drilling of unnecessary wells, and to protect correlative rights.

■ Section 38–08–07(4), N.D.C.C., specifically authorizes the Commission to modify "an order establishing spacing units" by allowing the drilling of additional wells on a spacing unit when found necessary to prevent waste, to avoid drilling unnecessary wells, or to protect correlative rights. The language of that statute recognizes several alternatives for the modification of an "order establishing spacing units." The Commission's authority to decrease the size of spacing units, as requested by the Hystads, is also found in Section 38–08–07(4), N.D.C.C., and is permitted when the Commission modifies "an order establishing spacing units." Thus, the Commission's authority to modify "an order establishing spacing units" by either downspacing or providing infill drilling is derived from the same statute, and nothing in that statute limits its scope to only proper spacing orders as opposed to temporary spacing orders. Construing that statute to apply only to proper spacing orders would cast considerable uncertainty over the status of the interests of owners during the 18-month developmental period covered by the temporary spacing order and would limit the orderly development of the pool. We believe that "an order establishing spacing units" as used in Section 38–08–07(4), N.D. C.C., applies equally to temporary spacing orders and proper spacing orders.

We conclude that, when entering its initial proper spacing order, the Commission may divide a pool into geographic zones, and establish different sized or shaped spacing units in each zone, including the drilling of additional wells within one zone on the spacing unit first established in a temporary spacing order. However, since the primary statutory requirement is units "of uniform size and shape for the entire pool," the Commission's authority to establish zones with different unit provisions for one pool requires express findings that such a spacing order is necessary to prevent waste, to avoid drilling unnecessary wells, or to protect correlative rights.

In the instant case, the parties concede that the non-uniform size spacing units were based on the Commission's determination that such spacing units were necessary to protect correlative rights. Prevention of waste and avoidness of unnecessary drilling were not involved. Thus, our analysis requires consideration of "correlative rights," a term not defined in our statutes providing for regulation of gas and oil production activities nor is the term defined in the regulations of the commission.

In *Amoco Production Co. v. North Dakota Indus. Comm'n., supra*, 307 N.W.2d at 842, fn. 4, we referred to the following definition of correlative rights:

"4. 'Correlative rights

"[T]he opportunity afforded, so far as it is practicable to do so, to the owner of each property in a pool to produce with-

---

7. Section 38–08–04, N.D.C.C., gives the Commission the authority to "promulgate and to enforce rules, regulations, and orders to effectuate the purposes and intent of this chapter."

out waste his just and equitable share of the oil or gas, or both, in the pool; being an amount, so far as can be practically determined, and so far as can practicably be obtained without waste, substantially in the proportion that the quantity of recoverable oil or gas, or both, under such property bears to the total recoverable oil or gas, or both, in the pool, and for such purposes to use his just and equitable share of the reservoir energy." Nev.Rev.Stat. § 522.020(2). There appear to be two aspects of the doctrine of correlative rights: (1) as a corollary of the rule of capture, each person has a right to produce oil from his land and capture such oil or gas as may be produced from his well, and (2) a right of the land owner to be protected against damage to a common source of supply and a right to a fair and equitable share of the source of supply. When a legislature or administrative body regulates production practices to protect against waste, it may also regulate to insure an equitable distribution of the source of supply. There is some dispute over the power of the state to regulate production practices to insure an equitable distribution of the source of supply, apart from waste. *See Treatise* § 204.6.' Williams & Meyer, Manual of Oil & Gas Terms (4th ed. 1976)."

▮ Thus, correlative rights includes interdependent rights and duties of each landowner in the common source of supply. Each landowner is entitled to a just and equitable share of oil or gas in the pool; however, that right is limited by the landowner's duty to all the other owners of interests in the common source of supply not to damage or take an undue proportion of the oil or gas from that common source of supply. *Dodds v. Ward,* 418 P.2d 629 (Okla.1966); 1 Summers, *Oil and Gas,* Section 63 (1954). The physical characteristics and reservoir dynamics of the common source of supply necessitate the use of highly technical geological and economic information to determine the extent of correlative rights. 1 Summers, *Oil and Gas,* Section 63 (1954). This information necessarily includes, if reasonably practicable, the physical size, shape, and location of the common source of supply relative to each owner's tract of land.

In *Larsen v. Oil & Gas Conservation Comm'n,* 569 P.2d 87, 92 (Wyo.1977), the Wyoming Supreme Court recognized the following minimum findings necessary to determine the extent of correlative rights in the context of prescribing the shape of spacing units:

"(1) the amount of recoverable oil in the pool; (2) the amount of recoverable oil under the various tracts; (3) the proportion that # 1 bears to # 2; and (4) the amount of oil that can be recovered without waste. See *Continental Oil Co. v. Oil Conservation Commission,* 70 N.M. 310, 373 P.2d 809. These findings were not made in this case. Without such findings, a reviewing court has no way to determine whether the owner of each property has been afforded the opportunity to produce without waste, so far as it is reasonably practicable, his *just and equitable share* of the oil in the pool (§ 30–216(i) ). In other words, it cannot determine whether correlative rights are being protected. As the court said in the *Continental Oil* case:

"'. . . That the extent of the correlative rights must be determined before the commission can act to protect them is manifest.'

"We will, therefore, require that the Commission make such findings, insofar as it is reasonably practicable to do so." See also Balkovatz, *Practice and Procedure Before Oil and Gas Commissions—Some Nuts and Bolts,* 25 Rocky Mtn.Min.L.Inst., 14–10–14–19 (1979).

▮ We recognize that findings on these factual questions may not always be practicable for a pool in the early stages of development, [*Grace v. Oil Conservation Commission of New Mexico,* 87 N.M. 205, 531 P.2d 939 (1975) ]; however, these factual questions suggest an appropriate focus for determining a just and equitable share of a common source of supply which is in

harmony with the definition of correlative rights. Even if a pool is in the early stages of development, the Commission's focus in establishing spacing units must consider the right of each owner to recover a just and equitable share of the common source of supply within the context of the other owners' interest in that common source of supply. When a deviation from the standard of a uniform size unit is necessary to protect correlative rights, the Commission must explain why the deviation is necessary within the context of the right of each owner to a just and equitable share of the common source of supply and the duty to other owners not to damage or take an undue proportion of oil or gas from that common source of supply. This is especially true because the physical characteristics and reservoir dynamics of a pool involve highly technical evidence.

In this respect, the Commission is an administrative agency subject to the Administrative Agencies Practice Act. Section 28–32–01(1), N.D.C.C.; *see Schank v. North American Royalties, Inc.,* 201 N.W.2d 419, 432 (N.D.1972). Section 28–32–13, N.D.C.C., requires agencies governed by this Act to "make and state concisely and explicitly its findings of facts and its separate conclusions of law, and the decision of the agency based upon such findings and conclusions." The findings of an administrative agency are adequate when they enable the reviewing court to understand the basis of the agency's decision. *Matter of Boschee,* 347 N.W.2d 331 (N.D.1984). Thus, we have remanded cases to agencies for the making of essential findings of fact so that the district court and this court can understand the basis of the agency's decision. *Kuhn v. North Dakota Public Service Commission,* 76 N.W.2d 171 (N.D.1956); *Hvidsten v. Northern Pacific Railway Co.,* 76 N.D. 111, 33 N.W.2d 615 (1948); *see Triangle Oilfield Services, Inc. v. Hagen,* 373 N.W.2d 413, 417 (N.D.1985).

In the instant case, the Commission's July 19, 1984 order stated, in part:

"(2) That geological and engineering evidence presented to the Commission relative to the matter of well spacing indicates that the Poe-Red River Gas Pool, as classified and defined in this order, should be developed on a pattern of one well to 320 acres in order to drain efficiently the recoverable hydrocarbons from said pool, assure rapid development, avoid the drilling of unnecessary wells, and prevent waste in a manner that will protect correlative rights.

"(3) That proper 320-acre spacing in the Red River Pool in this field will result in the efficient and economical development of the field as a whole and will operate so as to prevent waste and provide maximum ultimate recovery, will avoid the drilling of unnecessary wells, and will protect correlative rights.

"(4) That Commission Order No. 2708 set the temporary spacing for the Poe-Red River Pool on 640-acre spacing.

"(5) That proceeds from the sale of hydrocarbons from current Poe-Red River Pool wells have been shared by interests in the entire section.

"(6) That to protect correlative rights, sections with Poe-Red River producers should remain spacing units with a second well allowed to be drilled on them."

The Commission's October 19, 1984 order provided, in part:

"(7) That the Hystad # 15–2 and the Hystad # 11–31 wells have produced substantial quantities of hydrocarbons and the owners of interests in the 640-acre spacing units for the wells, as provided by Order # 2708 [temporary spacing order], have shared in the proceeds from such production. And further, in order for the owners of interests in the sections to receive their just and equitable share, such owners should continue to share in the production of the first well, as well as the production from the second well on the section."

█ These findings establish a deviation from the uniform size spacing unit throughout the pool "to protect correlative rights;" however, the findings do not elab-

orate on whose correlative rights are being protected or how they are being protected in terms of the focus provided by the definition of correlative rights. Furthermore, the findings provide for 320-acre spacing for the "efficient and economical development of the field as a whole ... to protect correlative rights" and yet permits 640-acre spacing for three sections of the seven section pool because proceeds from the wells on those sections have been shared by interests in the entire section and 640-acre spacing units on those sections will somehow protect correlative rights. Without further explanation [8], we are unable to discern how that conclusory basis for different size spacing units relates to an appropriate focus on correlative rights. We recognize that this subject entails administrative expertise; however, that expertise must be directed toward the statutory standards set forth by the legislature so that reviewing courts may have the benefit of that expertise. In this instance, the rea-

sons given do not enable us to understand the basis of the Commission's decision and are insufficient to sustain the deviation from uniform size spacing units.

Accordingly, we reverse and remand the case to the district court with instructions to remand to the Industrial Commission for further findings of fact and if appropriate, the presentation of additional evidence in accordance with this opinion.

ERICKSTAD, C.J., LEVINE, J., and PEDERSON *, S.J., concur.

VANDE WALLE, Justice, concurring specially.

Justice Meschke, for the majority, in a well-written opinion, has thoroughly analyzed the applicable statutes of our oil and gas conservation Act and I agree with most of what he has written. I do not agree that the findings of fact are so inadequate

---

**8.** The following testimony addressed deviation from uniform size spacing:

"*Mr. Fleck:* Now what is your recommendation, or what is the recommendation of Exeter going to be today with respect to this Poe-Red River Field?

"*Suzanne Tourtelot:* It is the recommendation of Exeter that for Sections 31, 36 and 2 where there are existing wells that the Commission provide for 640 acre spacing with a second allowable well in those sections and the balance of the Field be 320 acres.

"*Mr. Fleck:* And is it Exeter's feeling then that this would facilitate that transition from 640 to 320 and would eliminate many problems incident to the allocation of royalties?

"*Suzanne Tourtelot:* Yes, because of the past production and the currently existing pooling agreements and past payment of royalties, Exeter feels that the—the maintaining of the 640 acre spacing units with the second allowable well would make that a smoother transition.

"*Mr. Fleck:* Do you also feel that such would be more equitable between the various owners within the spacing unit?

"*Suzanne Tourtelot:* Yes, because of the past royalty situation we feel that it would be less burdensome for all concerned.

"*Mr. Fleck:* Now these three 640 acre units—31, 36 and 2 are all subject to either voluntary pooling agreements or declarations of pooling that were made pursuant to the terms and provisions of the oil and gas leases involved. Is that correct?

"*Suzanne Tourtelot:* Yes.

"*Mr. Fleck:* There are.—No one of those three were the subject of a forced pooling order by the Commission?

"*Suzanne Tourtelot:* No, there is no forced pooling in the Poe Field in these three existing sections.

"*Mr. Fleck:* And without delving into the details of the land matters which are really not too relevant but just briefly, is it true that none of these agreements or declarations are tied particularly to spacing?

"*Suzanne Tourtelot:* No, they were set up as voluntary declaration of poolings which were done either under the terms—as provided under the terms of the oil and gas leases or as signed by the individual landowners where necessary.

"*Mr. Fleck:* And, so then if the Commission elects to go on a 320 acre spacing pattern for this Field and if these 640 acre units were not maintained in those three sections, is it correct that you would have a serious question as to the persons entitled to payment of royalty?

"*Suzanne Tourtelot:* Yes, because there is a question as to whether those pooling agreements which are individual contractual relationship would survive.

"*Mr. Fleck:* In other words, survive any change in spacing?

"*Suzanne Tourtelot:* Yes."

---

* PEDERSON, Surrogate Justice, sitting in place of GIERKE, J., disqualified.

that I am unable to understand the basis of the Commission's decision.

Appellate courts often believe findings of fact prepared by trial courts and administrative agencies should be better. Aside from that, however, I believe the findings are minimally adequate for the purpose, although they do not provide us with a detailed explanation of the Commission's rationale. Those findings, as recited in the majority opinion, indicate that because all the mineral owners of the 640 acres included in the temporary spacing order shared in the production of the well, they should all continue to share in the production of the existing well and current wells to be drilled on the spacing unit. It is uncontested that one well will adequately drain only 320 acres. Therefore, one well could not adequately drain 640 acres although all the mineral owners of the 640-acre spacing unit shared in production. That cannot be undone. The Commission's position obviously is that in order to protect correlative rights in the future all owners should continue to share in the production of all wells on the 640-acre spacing unit. Were a second well to be drilled in which only the owners under that 320 acres would share—but who also had shared in the proceeds of the original well on the 640 acres—the unfairness becomes apparent. It appears obvious to me from the findings and conclusions that this is the Commission's method of protecting correlative rights. That task is far from an exact science and the scales may not weigh evenly.

The majority opinion recognizes that orders of the Commission are to be sustained if the Commission has regularly pursued its authority and its findings and conclusions are sustained by the law and by substantial and credible evidence. Section 38–08–14(4), N.D.C.C.; *Amoco Production Co. v. N.D. Indus. Com'n,* 307 N.W.2d 839 (N.D.1981). In *Amoco* we cited with approval *Citizens State Bank of Neche v. Bank of Hamilton,* 238 N.W.2d 655 (N.D. 1976), to the effect that substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. In addition to the testimony quoted in the majority opinion, I find the following colloquy in the transcript of the hearing before the Commission:

"*Mr. Bender:* ... would it protect correlative rights if a well is drilled in the N/2 of 2 and only the people in the N/2 of 2 would be able to share the production when they've had an opportunity to share in the production of the well in the S/2 of 2?

"*Ceci Searls:* It would be designed that if we get the 640 acres for the existing wells, that a well drilled in the N/2 of 2 would be shared equally by everyone in the 640 acres. Just as the well in the S/2 has been.

"*Mr. Fleck:* But, his question is if you didn't do that would that be fair?

"*Ceci Searls:* Would that be fair?

"*Mr. Fleck:* Would that be protecting correlative rights if you let the N/2 owners get all the royalty out of that after they've shared down here.

"*Ceci Searls:* No. I don't think it would.

.    .    .    .    .

"*Mr. Winkjer:* Just one if I may follow-up on that. But you're talking about that the N/2 of Section—that a well in the N/2 of Section 2 may not be drilled. You know, if you were to tell us today that you were going to drill a well in the N/2 of Section 2 we'd have no objection to your plan or the other half of either of these other sections. But it is the uncertainty, the speculativeness of having dual spacing within the same field and sharing oil with parcels of property that are not contributing that creates the problem. We'll go along with the—with this issue if you'll give us a commitment as to when these other wells will be drilled, or the leases for those other 320 acre tracts be given up and let the landowners then go out and do their own marketing to protect their correlative rights."

Additional dialogue between counsel for the respective parties and members of the staff of the Commission leave little doubt that the rationale is to protect correlative rights by requiring all who shared in the

original well to share in additional wells on the spacing unit because much of the oil had been produced during primary production.

The findings thus are adequate for me to understand the reasoning of the Commission in this regard. However, I am not convinced from the findings that in this instance it necessarily follows that correlative rights are being protected. The temporary order of the Commission proved to be incorrect in that we now know that one well will drain only 320 acres rather than 640 acres. Thus mineral owners shared in the production of a well who should not have shared therein. But an order requiring that a second well drilled on the 640-acre spacing unit should be shared in by all the mineral owners in that spacing unit is not, alone, a sufficient basis for a conclusion that correlative rights will be protected. Unless there are findings by the Commission, based on evidence before it, that there are sufficient reserves to justify the drilling of a second well on the unit in which the Hystads would share, I do not believe correlative rights would be protected. If, in fact, there will be no second well drilled because of marginal reserves or because of other factors known to the Commission from the evidence before it, the order before us only perpetuates the inequity created as a result of the temporary spacing order permitting mineral owners whose property is not drained by the well on the Hystads' property to continue to share in that well.

It may be that a second well on the spacing unit would produce in as large or greater quantities than the current well, but the Hystads have indicated they are willing to risk the possibility that another well will be drilled in the spacing unit from which they would not share in the production. Although their preference is not decisive, it is their correlative rights, along with those of other mineral owners in the spacing unit, which are to be protected.

The Commission may have adopted a *per se* presumption that in each instance in which the Commission reduces the spacing in a field in which wells have been drilled and in which there are spacing units with diverse mineral ownership that the type of order here at issue will be entered to protect correlative rights. Although such an order has some ease of decision-making, it should not necessarily be determinative where, such as here, there is objection to that presumption. I agree with Justice Meschke that the decision in *Larsen v. Oil & Gas Conservation Comm'n*, 569 P.2d 87 (Wyo.1977), has much to recommend it, although I am not convinced that such information is always available to the Commission.

I cannot determine from the findings nor, for that matter, the evidence before the Commission, the specific testimony necessary to a determination of these concerns and I therefore concur with the remand for the purpose of receiving additional evidence and making further findings.

LEVINE, J., concurs.